291 N.J. Super. 517 (1996)
677 A.2d 1137
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT/CROSS-APPELLANT,
v.
RODNEY F. LYLES, DEFENDANT-APPELLANT/CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted April 30, 1996.
Decided June 21, 1996.
*519 Before Judges PRESSLER, WEFING and A.A. RODRIGUEZ.
Brown and Brown, P.C. and Alan Dexter Bowman, P.A., attorneys for appellant/cross-respondent (Alan Dexter Bowman, of counsel and on the brief).
Deborah T. Poritz, Attorney General, attorney for respondent/cross-appellant (Nancy Peremes Barton, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is a date-rape case. Following a trial by jury, defendant Rodney F. Lyles was convicted of first-degree kidnapping, N.J.S.A. 2C:13-1b; third-degree terroristic threats, N.J.S.A. 2C:12-3a; first-degree aggravated assault by reason of sexual assault during the commission of a kidnapping, N.J.S.A. 2C:14-2a(3); and second-degree sexual assault, N.J.S.A. 2C:14-2c(1). Defendant was sentenced to a twenty-year term on the kidnapping charge, into which the first-degree aggravated assault was merged. He was also sentenced to a concurrent three-year term on the terroristic threats conviction and a concurrent seven-year term on the second-degree sexual assault. Appropriate VCCB and SNSF penalties were also imposed.
In challenging the judgment of conviction, defendant raises two issues, the first involving fresh-complaint evidence and the second involving the court's failure to hold a hearing to determine his *520 competency to stand trial. Defendant does not raise an appellate challenge to the sufficiency of the evidence to support either the kidnapping conviction or the conviction of sexual assault during the course of kidnapping, although the trial court did deny defendant's motion for acquittal of these two charges. Because, however, of our concern with the adequacy of the State's proofs to support those two convictions, we afforded the parties the opportunity to submit supplemental briefs on that issue. Having considered the record in the light of all the briefs, we are now satisfied that while neither the trial court's handling of the fresh-complaint evidence nor its failure to have held a competency hearing constituted plain error, the two first-degree convictions cannot stand because of insufficiency of evidence.
The State's case depended on the testimony and hence the credibility of the complaining witness, I.P. There was no corroborating physical evidence, and defendant, although he had no prior criminal or juvenile record, did not testify on his own behalf. This is what I.P. testified to.
In August 1993, I.P., then twenty-four years old and employed as a sales agent by Continental Airlines at Newark Airport, moved to a studio apartment in Elizabeth. Because she knew no one in Elizabeth and was of athletic inclination, she joined the neighborhood YMCA, enrolling in an exercise and nutrition program. It was her custom to walk to the YMCA from her home and back. On the evening of Wednesday, August 25, 1993, she finished her workout late, about 9:30 p.m., and was concerned about walking home in the dark. One of the instructors suggested that defendant, then twenty-seven years old and also a participant in the program, drive I.P. home. The instructor vouched for defendant, telling I.P. that he would trust defendant with his own sister. I.P. agreed.
On the way home, I.P. and defendant agreed to stop for something to eat and went to a neighborhood gyro restaurant. While there, they were handed a flyer promoting a pool party that weekend, and they discussed going together. As they became acquainted, they agreed to spend more time together that evening *521 to get to know each other. Because I.P.'s furniture had not yet arrived at her new apartment, they agreed that they would first stop there to pick up some board games and then drive to defendant's house in Plainfield to spend the rest of the evening. They followed this program, playing the games and talking.
Shortly after midnight, I.P. told defendant she had to go home as she had to be up at 4 a.m. to go to work. Defendant responded that he was too tired to drive and suggested that she remain overnight in his house, assuring her that he would drive her home the next morning in time for her to get ready for work and that he would then drive her to work. I.P. agreed, and defendant showed her into a bedroom. He joined her there, lying next to her. They embraced. As she explained, "[w]e were just kissing with each other. I turned over to let him lay on top of me, and we were still kissing." At that point defendant attempted to initiate an act of penetration. I.P. stopped him, saying "[n]o, we don't really know each other that well. Let's not do this. We just met." Defendant promptly acquiesced, and the two fell asleep. The following morning he took I.P. home, waited for her to change into her working clothes, drove her to the airport, and arranged to pick her up and drive her home at the end of the day. He did so. On the way home, they talked again about going to the pool party together. Defendant apparently was not sure and gave I.P. his phone number, asking her to call him. At that point I.P. still had not yet had a telephone installed in her new apartment. In any event, defendant left her at her door. That was Thursday evening. I.P. described her feelings about defendant at that point as follows:
I thought he was a real nice guy. The fact that he did all these things for me, and I felt he would have been a good friend to have, and everything. The fact that everything that happened, the respect that he gave me at a time, I didn't oppose of seeing him anymore. I was looking forward to going to the pool party with him.
On the next day, I.P. and defendant ran into each other leaving the YMCA. I.P. had not actually expected to see him and had written a note to him, which she was going to leave on his car. The note, as she described it, expressed her thanks for his *522 friendliness to her and said she liked him as a friend. She gave him the note, and after a brief conversation, they went their own ways.
I.P. and defendant did not see each other again until Sunday, the day of the pool party. Defendant had left several notes on I.P.'s car asking her to call him. She did not do so until Sunday morning because of her busy work schedule and her limited access to a telephone. Defendant apparently then expressed some annoyance because it had taken her so long to call him, but nevertheless arranged to pick her up at her home at 3 p.m., three hours before the start of the party. As we understand I.P.'s testimony, there was a $25 per person admission charge, and defendant had told her he would pay for them both. When he picked her up at the appointed time, he first made several stops either to borrow the money or to try to call in money owed to him. He was unsuccessful. They reached the pool party at about 5:30, and defendant waited for some of his friends, apparently fellow corrections officers, to arrive. Eventually, they were able to gain admission either on a complementary basis or at a reduced rate. Once inside, defendant stayed with his friends and I.P. circulated on her own, playing volleyball and entering a dance contest, which she won. She explained that "I was kind of glad we went our separate ways, the fact that he was in a bad mood. So, I just went ahead and tried to say I was going to have a good time in spite of his mood...." Although the pool party was over at 11:30, the sponsors of the party had arranged for an "after party" at a club. I.P. and defendant, who had rejoined each other by that time, agreed to go together to the "after party." Defendant had a change of clothes in his car, but I.P. had to go home to change. Defendant drove her, and at her suggestion they stopped at a Chinese restaurant for take-out food at I.P.'s expense, detouring on the way there so that she could make a cash withdrawal at an automatic teller machine. She wanted to pay because, as she said
... he seemed to be a nice person. He paid for me to get into the pool party, or got me in I should say. He had purchased the Gyro. He was just  I thought it was a good thing to do on a friendship basis. My turn, his turn thing.
*523 The events that led to these charges and convictions occurred after defendant and I.P. returned to her apartment with their Chinese food. Defendant brought in his bag, which I.P. assumed contained the clothes into which he would be changing. They ate the food with the intention of changing afterwards and going to the "after party." I.P., however, had some stomach distress after eating, and she lay down on the opened sofa bed that had just recently been delivered to her. She was still wearing her bathing suit and a T-shirt over it. Defendant lay down next to her, saying "I want to hold you." She attempted to rebuff his advances, saying she did not feel well. Defendant became hostile, telling her she was not getting up and that she would feel the pain she had made him feel. He told her no one would believe her protestations and he could either cut off her hair or pull her teeth out with pliers if she did not yield to him. Nevertheless, he allowed her to go into the bathroom. Not knowing how to extricate herself from her predicament, she eventually came out of the bathroom and saw defendant disrobed and putting on a condom. He then forced himself on her against a bar stool. I.P. described what happened after defendant effected the rape:
Q And after it was over, what happened?
A He told me to go get him something to drink. Then when I went to get him a soda. He goes, "What is this? Are you trying to poison me"?
Q What did you bring him to drink?
A There was a soda, an orange soda or something, or Pepsi, I don't remember, and it was an orange soda I brought him, and he goes, "Are you trying to poison me"? And I said, "No." Then 
Q Why would he say that? What was there about the soda?
A It was flat. Then he started trying to act nice to me. He started telling me, "If I hurt you, I'm sorry." He tried to get all sensitive, like, if he cared, or something.
So, I just told him to get out of my house. You came  you did what you came here to do. He told me, "I want to talk to you." I told him, "Just leave," and he still wouldn't leave. He started telling me it would better our relationship, that he did this for us both, and that he loved me, and I told him, "You don't even know me." I told him, "Just get out." He still wouldn't leave. I told him, "Here, get dressed," and I threw him his clothes. He wouldn't leave. And I said, "If you won't leave, then I'll leave," and I went to walk to the door and he pushed me back in the living room. He still wouldn't leave, so, I said, "Fine, *524 then. I'll just burn the house down." So, I tried setting the garbage on fire. He just took the garbage bag and put it out in the sink. So, when he went to the sink I went to the door. Then he ran to the door and he slammed the door, and so I told him, "Just to get out," and he still wouldn't leave. So, I tried opening the door, anyway.
I went back to the stove. He came back to me and I just hurried up and opened the door, and then because I tried to throw the fire at him, again, he went out into the hall. So, I tried to slam the door and he put his foot in the door, and he still is telling me, "I want to talk to you." I told him, "I have nothing to say to you. You came here and did what you wanted to do. Just leave." So, he wouldn't leave. So, I went under the counter to get this stuff for birds, and it's like mace to humans, but it's poison to humans. It's lice spray for birds. When I went to spray it in his face he moved his foot and I slammed the door, and he still stood outside the door telling me, "[I.] open the door, open the door. I want to talk to you."
I didn't know what else to do. I didn't have a phone, so I couldn't call for help. So, I just went in the living room and sat there on the floor.
Q Did there come a time when he left, [I.]?
A There was awhile he, finally, left. He kept  I just ignored him. It was like almost an hour. He just stood there saying, "I love you, [I.] Open the door. I want to talk to you." Then when I know I heard the front door close, I looked out the window to make sure it was him leaving, and it was, but I just stayed there and I tried cleaning up my house to try to erase what happened to me. So, I let the sleeper up, and I went in the bathroom and I tried to take a shower, and I wanted to, at least, do something to change what happened to me. So, I tried to go to work. I couldn't work that day.
Although the testimony is not specific about the time periods involved, we extrapolate as follows. First, I.P. testified that the pool party was over at 11:30 and that there was some congregation of friends and discussion as to who would be riding with whom in whose car after it was over. Then I.P. and defendant drove to the bank where I.P. made her ATM withdrawal. Then they drove to the Chinese restaurant where they ordered their take-out meal and waited for it to be prepared. Then they drove to I.P.'s apartment. Then they ate the Chinese food. It seems unlikely that these events, up to the point when I.P. lay down on the sofa bed, could have taken less than an hour to an hour-and-a-half, making the onset of the assault roughly 12:30 or 1:00 a.m. According to I.P.'s testimony, defendant finally left the apartment building at about 3:15 a.m., after having remained outside her apartment door for about an hour. It therefore appears that the *525 events that took place in the apartment, from the time defendant joined I.P. on the sofa bed until he finally left the apartment, including the unspecified interval during which I.P. was in the bathroom, occurred over a maximum interval of between an hour and an hour-and-a-half.
If there was evidence supporting a first-degree kidnapping as defined by N.J.S.A. 2C:13-1b, it must be gleaned from I.P.'s testimony. There was no other evidence. We thus consider her testimony in the light of the statutory definition of the crime, accepting it as true and affording it all inferences favorable to the State. State v. Reyes, 50 N.J. 454, 458-459, 236 A.2d 385 (1967). N.J.S.A. 2C:13-1b provides as follows:
A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:
(1) To facilitate commission of any crime or flight thereafter;
(2) To inflict bodily injury on or to terrorize the victim or another; or
(3) To interfere with the performance of any governmental or political function.
Obviously, a removal of the victim is not here involved. The question, rather, is whether I.P.'s testimony can support a finding that defendant had, within the intendment of the statute, unlawfully confined her for a substantial period with a proscribed purpose. We conclude it does not.
We begin by noting that I.P., beyond question, described a second-degree sexual assault as defined by N.J.S.A. 2C:14-2c(1), namely an act of sexual penetration in which the "actor uses physical force or coercion, but the victim does not sustain severe personal injury." It would have been a first-degree aggravated sexual assault if committed during the commission of a kidnapping. N.J.S.A. 2C:14-2a(3). The issue, of course, is whether there was a kidnapping or whether the restraint, detention, force, and coercion used by defendant was incidental to and constituted only the "force or coercion" element of second-degree sexual assault. We are persuaded that defendant's conduct, as described by the victim, did not constitute the first-degree crime of kidnapping *526 based on an unlawful confinement for a substantial period with the purpose of committing rape or other unlawful purpose. For that reason as well, we are satisfied that this was not a first-degree sexual assault, that is, a rape committed during the course of committing a kidnapping.
Prior to the adoption of the Criminal Code by Title 2C, New Jersey's kidnapping statute, N.J.S.A. 2A:118-1 followed the common law by requiring asportation as an element of kidnapping. State v. Masino, 94 N.J. 436, 440-441, 466 A.2d 955 (1983). We thus begin our analysis with State v. La France, 117 N.J. 583, 569 A.2d 1308 (1990), in which the Supreme Court first addressed the unlawful-confinement alternative to the asportation element. La France recognized the difficulty in defining the confinement element, particularly when confinement appears to be ancillary to the crime that was its purpose. That is to say, the problem is always to determine whether the confinement itself constitutes an independent first-degree crime or whether it merely satisfies an element of another and often less serious crime. La France further recognized "the modern approach" of construing kidnapping statutes in order to prevent prosecutorial zeal from elevating "lesser crimes into more serious crime[s]." Id. at 587, 569 A.2d 1308. Reviewing the authorities, including the Model Penal Code, the Court concluded that the confinement cannot constitute a separate first-degree kidnapping if it is "`merely incidental' to the commission of other substantive crimes and does not substantially increase the risk of harm beyond that necessarily present in the crime itself." Ibid. Noting that the purpose of the various detention-kidnapping formulations is to "guide the qualitative judgment of juries" in determining whether the confinement significantly increases the dangerousness and undesirability of the defendant's conduct, ibid., the Court gave its further endorsement to the four-prong test formulated by the Third Circuit in Virgin Islands v. Berry, 604 F.2d 221, 227 (3d Cir.1979), namely
(1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) *527 whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

La France, 117 N.J. at 587-588, 569 A.2d 1308.
Considering the State's proofs here in the light of the principles articulated by La France, we are persuaded that reasonable minds could not differ in concluding that defendant's conduct, while opprobrious and certainly constituting the heinous second-degree crime of sexual assault, cannot be reasonably construed as also constituting an independent crime of first-degree kidnapping by unlawful confinement. Indeed, we think it plain that a forcible rape is unlikely to be committed without, at the least, a degree of force and coercion such as used by defendant here. Simply put, the force and coercion used by defendant in putting I.P. in fear and in physically overpowering her constituted, and was indeed congruent with, the force and coercion necessary to satisfy that element of rape as defined by N.J.S.A. 2C:14-2c(1). Defendant's use of force and coercion certainly put I.P. at risk that she would be actually raped. There is nothing in this record, however, to suggest that she was thereby put at risk of any other or more serious crime against the person.
The State argues that defendant's conduct in remaining outside I.P.'s door after she finally got him out of her apartment constituted, either in combination with his previous conduct in the apartment or independently thereof, an unlawful confinement constituting first-degree kidnapping. The State's point is that defendant's presence outside her apartment under the circumstances made her a prisoner in her own home, particularly since she had no telephone with which to summon help. We regard the argument as specious. I.P. was no longer in any danger from defendant; her front door was securely locked against him. Nor, if she felt in danger, was there anything to prevent her from opening one of her apartment windows and summoning help. There was nothing isolated about her apartment building. It was in the middle of Elizabeth. Under all the circumstances here, we believe a bizarre result would obtain if defendant's trespass outside I.P.'s door were converted into a first-degree kidnapping with a twenty-year mandatory *528 sentence simply by reason of the fortuity of her not yet having had her telephone installed.
As we have pointed out, the kidnapping offense here charged has inherent definitional problems. We therefore take the view that a common sense, common experience standard must prevail. Thus, we have no doubt that measured by such a standard, the community at large would severely condemn the conduct of defendant, an invited guest into I.P.'s home who lost control over himself, abused her badly, and committed against her the abominable crime of forcible rape. That crime is bad enough. We have grave doubt, however, that the community would also regard I.P. to have been the victim of the even more abominable and more serious crime of kidnapping. We understand that this jury was instructed in accordance with appropriate model charges and found defendant guilty of that crime. Our conviction, however, is that that crime never should have gone to the jury. The evidence adduced by the State did not support it. Nor did it support guilt of the first-degree crime of committing a rape during the course of committing a kidnapping. The whole point is, as we see it, that the unlawful confinement element of the kidnapping statute occurred during the course of and ancillary to the rape, not vice versa.
We have reviewed judicial precedents in this and our sister jurisdictions, and we have found no instance of a kidnapping conviction sustained on evidence such as that adduced here. To the contrary, in similar circumstances, the kidnapping conviction has been reversed based on the appellate court's perception that the confinement was incidental to and not independent of the rape or other underlying crime and did not substantially increase the victim's risk. See, e.g., Summerlin v. State, 296 Ark. 347, 756 S.W.2d 908 (1988); Weber v. State, 547 A.2d 948 (Del. 1988); People v. White, 88 A.D.2d 940, 450 N.Y.S.2d 866 (1982); State v. Reiman, 284 N.W.2d 860 (S.D. 1979); State v. Cabral, 228 Kan. 741, 619 P.2d 1163 (1980); State v. Johnson, 92 Wash.2d 671, 600 P.2d 1249 (1979), cert. dismissed, 446 U.S. 948, 100 S.Ct. 2179, 64 *529 L.Ed.2d 819 (1980). By the same token, where the kidnapping conviction based on conduct also involving a rape has been sustained, the actions of defendant in either removing or detaining the victim have been significantly more egregious than those here in terms of dangerousness of the defendant, risk to the victim of a separate harm, and duration of the confinement. See, e.g., State v. Brent, 137 N.J. 107, 644 A.2d 583 (1994); State v. Cole, 120 N.J. 321, 576 A.2d 864 (1990); State v. Blacknall, 288 N.J. Super. 466, 672 A.2d 1170 (App.Div. 1995), aff'd 143 N.J. 419, 672 A.2d 1132 (1996); State v. Ellis, 280 N.J. Super. 533, 656 A.2d 25 (App.Div. 1995); State v. Buhl, 269 N.J. Super. 344, 635 A.2d 562 (App.Div.), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994); State v. Tronchin, 223 N.J. Super. 586, 539 A.2d 330 (App.Div. 1988); State v. Arp, 274 N.J. Super. 379, 644 A.2d 149 (Law Div. 1994). Compare State v. Bryant, 217 N.J. Super. 72, 524 A.2d 1291 (App.Div.), certif. denied, 108 N.J. 202, 528 A.2d 24 (1987), cert. denied, 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987); State v. Smith, 210 N.J. Super. 43, 509 A.2d 206 (App.Div.), certif. denied, 105 N.J. 582, 523 A.2d 210 (1986).
We consider the issues defendant did raise on appeal in the context of the two remaining convictions, second-degree forcible rape and terroristic threats. With respect to the fresh-complaint issue, we note first that the judge, in a preliminary hearing, ruled the proffered fresh-complaint testimony inadmissible on the ground that the witness was not a natural confidante of the victim's. See, generally, State v. Hill, 121 N.J. 150, 162, 578 A.2d 370 (1990). Despite the ruling, the prosecutor elicited testimony from that witness permitting the jury to draw the fresh-complaint inference in direct violation of the judge's evidential ruling. The defense moved for a mistrial. In a thoughtful consideration of the question, the judge concluded that no irreparable damage had been done and that any potential prejudice could be avoided by a curative charge. He therefore denied the motion and gave a careful curative instruction to the jury. Our review of the record satisfies us that defendant's rights were scrupulously protected. *530 There was no impairment in these events of his right to a fair trial.
The State has cross appealed from the court's holding that the fresh-complaint evidence was inadmissible. We dismiss the cross appeal as moot in view of our affirmance of the rape conviction.
We also reject defendant's claim that the trial court erred by not holding a competency hearing. The issue was raised, the court inquired into it appropriately, and counsel urged the competency of his client. We are satisfied that under the circumstances no competency hearing or further inquiry into defendant's competency to stand trial was warranted.
The convictions of first-degree kidnapping and first-degree sexual assault are vacated. We remand to the trial court for appropriate modification of the judgment of conviction to so reflect. We affirm the convictions of second-degree rape and third-degree terroristic threats, and remand for resentencing on those convictions. Defendant may, at the resentencing, argue for the merger of the terroristic threat conviction into the rape conviction on the ground that the threats constituted part of the coercion element of the rape offense. We leave that matter to the trial judge. We do not retain jurisdiction.