773 A.2d 739 (2001)
340 N.J. Super. 47
STATE of New Jersey, Plaintiff/Respondent,
v.
Juan R. SOTO, Defendant/Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 11, 2001.
Decided June 13, 2001.
*742 Peter A. Garcia, Acting Public Defender, attorney for appellant (Jodi L. Ferguson, Assistant Deputy Public Defender, of counsel and on the brief).
John J. Farmer, Jr., Attorney General of New Jersey, attorney for respondent (Russell J. Curley, Deputy Attorney General, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges WALLACE, Jr., CARCHMAN and LINTNER. *740
*741 The opinion of the court was delivered by WALLACE, Jr., J.A.D.
Following a jury trial defendant was convicted of aggravated manslaughter, N.J.S.A. 2C:11-4(a); felony murder, N.J.S.A. 2C:11-3(a)(3); robbery, N.J.S.A. 2C:15-1; conspiracy to commit robbery, N.J.S.A. 2C:15-1, and N.J.S.A. 2C:5-2; kidnapping, N.J.S.A. 2C:13-1(b); burglary, N.J.S.A. 2C:18-2(a); possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a); and possession of a crossbow for an unlawful purpose, N.J.S.A. 2C:39-4(d). The trial judge merged the aggravated manslaughter and burglary counts with the felony murder count and imposed a sentence of life with a thirty-year period of parole ineligibility on the felony murder conviction. The judge also merged the conspiracy conviction and weapons counts into the robbery count and imposed a concurrent sentence of twenty years with a ten-year period of parole ineligibility on the robbery conviction and imposed a concurrent sentence of thirty years with a *743 fifteen-year period of parole ineligibility on the kidnapping conviction.
On appeal, in his main brief defendant contends: (1) the State failed to comply with the Uniform Extradition Act and therefore his statement was inadmissible; (2) it was error to admit hearsay testimony that a non-testifying codefendant implicated defendant; (3) the admission of Timoteo Terron's prior inconsistent statement violated State v. Gross, 121 N.J. 1, 577 A.2d 806 (1990); and (4) his sentence was excessive. In his pro se brief defendant contends (1) the cumulative errors deprived him of a fair trial; (2) there was insufficient evidence to convict him of kidnapping; (3) the judge failed to instruct the jury to indicate which of the felonies it chose as the predicate felony for felony murder; and (4) the sentence was invalid. We reverse the kidnapping conviction and remand for resentencing. In all other respects we affirm.
We need not recount the facts at length. The State presented evidence to show that Mohamed Maghoub, the owner of a used car lot, taxicab company, and several rental properties in Trenton, was introduced to Ivelisa Figueroa in January 1996. Maghoub and Figueroa became friends. Figueroa told defendant about Maghoub and discussed a plan to rob Maghoub. Defendant asked three of his friendsMartin Robles, Elvis Terron and Timmy Terron to help him in the robbery. Except for Timmy, all agreed.
Around 9:30 p.m. on January 30, 1996, Figueroa visited Maghoub at his house. While there, she called defendant and told him to proceed with the robbery. Defendant, Robles, and Elvis drove to an area near Maghoub's house. After their arrival, they decided not to commit the robbery. When they went to leave however, the car would not start. Defendant called Timmy and asked him to drive over and help them jump-start the car. While waiting for Timmy to arrive, the three men changed their minds again and decided to proceed with the robbery.
Defendant, Robles, and Elvis entered Maghoub's house through a rear door and saw Maghoub sitting on the living room couch with Figueroa. Defendant was carrying a shotgun and Robles was carrying a crossbow. Defendant "racked" a round into the shotgun chamber to scare Maghoub and told him not to move. Maghoub immediately screamed and jumped at defendant, grabbing the shotgun. They wrestled for the shotgun, moving into the hallway and falling on the floor, both of them still holding onto the gun. Elvis tried to wrap duct tape around Maghoub's mouth to stifle his screams. In the struggle, the gun went off and Figueroa was struck in the thigh. Defendant yelled for Robles to help him. Robles gained control of the shotgun and started hitting Maghoub on the head with it.
Defendant then ran upstairs to look for a briefcase which Figueroa said contained money. Defendant returned downstairs. Maghoub was on the floor and still breathing at that time. Defendant searched through Maghoub's pockets, and removed his wallet. He also removed two rings and two bracelets from the victim.
Defendant, Figueroa, Robles, and Elvis then fled through the backdoor of the house. The group ran through the backyard down to a railroad yard where they hid the shotgun and crossbow and broke open and left the brief case which only contained documents relating to Maghoub's used car lot.
The group then went to Timmy's apartment where they discussed the incident. Timmy's father, Timoteo Terron, heard the group boasting about what happened and scolded them. Defendant divided the proceeds *744 of the robbery, which included $260, the rings and the bracelets. Timoteo attempted to help Figueroa with her gun shot wound. Figueroa refused to go to the hospital because she was afraid. She told Timoteo she was shot when defendant and Maghoub were wrestling with the shotgun. Defendant, Robles, and Elvis left the apartment, but Figueroa stayed the night, nursing her injury.
The next morning defendant contacted Ann Marie Perez to help Figueroa. Perez accompanied defendant and Timmy to the apartment to check on Figueroa. Figueroa was in bed, so her wound was not visible to Perez. Figueroa told Perez she had spent the night out and her aunt would be angry at her. She asked Perez to go to her aunt's house and bring back some clothes which Perez did later that day. When Perez returned with the clothes, she noticed the bandage on Figueroa's leg. She asked Figueroa what happened. Figueroa explained she was accidentally shot when defendant and some others tried to rob someone.
Perez left. The next morning she read about Maghoub's murder in the newspaper and realized Figueroa was involved. She learned from Figueroa's aunt that the police were looking for Figueroa. Later that day she went back to Timmy's apartment and urged Figueroa to give herself up. Figueroa agreed and turned herself into the police.
On February 1, defendant asked Michael Valentin to drive him to the Philadelphia International Airport for a flight to Puerto Rico leaving the next morning, supposedly because his mother had died. Valentin dropped defendant off at the airport around 6:00 p.m. and returned to Trenton. The police arrived at Valentin's house sometime after midnight and asked if he knew where defendant was. Valentin told them he had taken defendant to the airport and described what defendant was wearing.
In the early morning of February 2, Detective David Maldonado sent out a general alarm for defendant. At 4:15 a.m., a Philadelphia police officer patrolling the airport heard the report and located defendant at the airline ticket counter. He arrested defendant and transported him to the Philadelphia police headquarters known as the Roundhouse. After Maldonado was informed of defendant's arrest, he immediately obtained an arrest warrant for defendant and, along with Detective Jack Kemler, drove to Philadelphia to interview defendant.
Maldonado, who spoke fluent Spanish, interviewed defendant in Spanish. He read defendant a Spanish Miranda form and had defendant read and sign it. Defendant initially told Maldonado he knew nothing of Maghoub's murder. After Maldonado described the details the police knew, defendant began to weep and admitted he was responsible for the robbery but not the murder. Maldonado interviewed defendant for about an hour, between 7:00 and 8:00 a.m. Around that time, Detective Robert Farabelli informed Maldonado of Pennsylvania's "six-hour rule" where the police have six hours from the time a defendant is taken into custody until the time a statement must begin or else they have to get permission from the district attorney to question a defendant.
Farabelli called Charles Gallagher, chief of homicide in the Philadelphia District Attorney's office, and discussed the possibility of defendant waiving his right to an extradition hearing. Gallagher replied that if defendant wanted to waive his right to a hearing and return to Trenton, he would have to sign a formal statement saying he was the person the Trenton police were looking for and that he understood the rights he was waiving. Farabelli *745 relayed this information to Maldonado, and Maldonado asked defendant whether he was willing to waive his right to an extradition hearing. Defendant said yes. Maldonado then typed a waiver statement in English and translated it into Spanish before defendant signed the form.
After defendant executed the waiver of extradition form, Maldonado and Kemler escorted him back to Trenton. During the drive to Trenton, defendant again indicated he was only responsible for having the shotgun but not for the death of the victim.
Once they arrived at the Trenton Police Headquarters, Maldonado obtained a formal written statement from defendant. Defendant explained the events that led to the murder. He admitted he held the shotgun when he and the codefendants entered Maghoub's home, that Maghoub was badly beaten, and that he rummaged through Maghoub's pockets looking for money.
The police arrested Elvis, Timmy, and Robles on February 1. They also confiscated the clothing and sneakers Elvis wore at the time of the homicide. Subsequent analysis of the clothing and sneakers revealed the presence of blood, although it could not be determined whose blood it was. Later that same day, Elvis took the police to a railroad yard near Olden Avenue where the police found a shotgun, crossbow, and Maghoub's briefcase. An analysis of the weapons recovered at the railroad yard revealed that blood found on the shotgun belonged to the victim. A ballistics analysis performed by the New Jersey State Police determined that the shotgun pellets recovered from the wall of Maghoub's house were fired from the shotgun recovered at the railroad yard.
Later, the police searched Timmy's apartment and found several of the victim's rings in a pipe under the kitchen sink. An analysis of the calling records of defendant's cellular telephone as well as Robles' cellular telephone revealed that several calls were placed or received by defendant to both Robles and Timmy shortly before and after the murder but none between 9:53 p.m. and 11:27 p.m. on January 30.
An autopsy was performed on Maghoub by Doctor Raafat Ahmad, the Chief Medical Examiner of Mercer County. Doctor Ahmad concluded Maghoub died between the late evening hours of January 30 and the early morning hours of January 31. She found his head injuries were caused by blunt force trauma, consistent with being bludgeoned with the barrel of a shotgun. Doctor Ahmad ruled the death a homicide and determined the cause of death was due to massive cranial cerebral injuries.
Defendant did not testify nor did he present any evidence or witnesses. As noted, the jury found defendant guilty of aggravated manslaughter, felony murder, conspiracy, kidnapping, burglary, and weapons possession charges.

I
Defendant contends his confession should be suppressed because it was obtained after he was improperly extradited from Pennsylvania. Specifically, he claims the procedure followed when he waived his right to an extradition hearing was defective and failed to comport with the Uniform Extradition Act. He faults the police for failing to explain his right to contest extradition before a judge and for failing to consult a judge about the validity of the waiver.
Both New Jersey and Pennsylvania are signatories to the Uniform Criminal Extradition Law, N.J.S.A. 2A:160-1 to 35; 42 Pa.C.S.A., § 9121-9171. The procedures for waiver of extradition are outlined in *746 N.J.S.A. 2A:160-30 and in the Pennsylvania statute 42 Pa.C.S.A. § 9146. Our statute provides in part:
Any person arrested in this state charged with having committed any crime in another state or alleged to have escaped from confinement, or broken the terms of his bail, probation or parole, may waive the issuance and service of the warrant provided for in sections 2A:160-15 and 2A:160-16 of this title and all other procedure incidental to extradition proceedings, by executing or subscribing in the presence of a judge of any criminal court of record within this state a writing which states that he consents to return to the demanding state. Before such waiver shall be executed or subscribed by such person it shall be the duty of such judge to inform such person of his rights to the issuance and service of a warrant of extradition and to obtain a writ of habeas corpus as provided for in section 2A:160-18 of this title.
... Nothing in this section shall be deemed to limit the rights of the accused person to return voluntarily and without formality to the demanding state, nor shall this waiver procedure be deemed to be an exclusive procedure or to limit the powers, rights or duties of the officers of the demanding state or of this state.

[N.J.S.A. 2A:160-30 (emphasis added).]
The plain reading of the Act indicates a fugitive may waive extradition either formally or informally. See generally, State v. Arundell, 278 N.J.Super. 202, 205, 650 A.2d 845 (Law Div.1994); Buchanan v. City of Kenosha, 90 F.Supp.2d 1008, 1014 (E.D.Wis.2000). While we have not addressed the issue, other state and federal courts have recognized the validity of extradition which did not occur in the presence of a judge. Commonwealth v. Green, 525 Pa. 424, 581 A.2d 544, 555 (1990); State v. Hughes, 494 A.2d 85, 89-90 (R.I.) cert. denied, 474 U.S. 1009, 106 S.Ct. 536, 88 L.Ed.2d 466 (1985); Hagans v. United States, 408 A.2d 965, 966-67 (D.C.1979). The Green court explained that "logic, common sense, and a plain and simple reading of the statute permits knowing, intelligent and voluntary and non-coercive waivers of extradition without a formal appearance before a judge in the asylum state." Green, supra, 581 A.2d at 556. We are in complete accord with that view.
Federal courts have articulated three requirements for a valid informal waiver of extradition: "(1) an unequivocal statement by the accused of his intent to waive extradition rights, (2) made voluntarily, and (3) with some rudimentary understanding of the rights being relinquished." Buchanan v. City of Kenosha, 90 F.Supp.2d 1008, 1015 (E.D.Wis.2000) (citing McBride v. Soos, 512 F.Supp. 1207, 1212-13 (N.D.Ind.1981), aff'd, 679 F.2d 1223 (7th Cir.1982)); see also Pierson v. Grant, 527 F.2d 161, 164 (8th Cir.1975)(waiver of extradition rights voluntary as long as accused had a general knowledge and understanding of what was involved in the waiver when he signed it); Morrison v. Stepanski, 839 F.Supp. 1130, 1140 (M.D.Pa.1993) (waiver of extradition rights must be "knowing" in the sense that the alleged fugitive understands that he has certain rights under the law and affirmatively indicates an intention to relinquish those rights and "voluntary" in the sense that it was given of the individual's free choice); United States v. Pennsylvania State Police, 548 F.Supp. 9, 15 (E.D.Pa.1982) (fugitive has right to waive rights in writing but only after they have been fully explained to him).
Here, prior to trial, a Miranda hearing was held where Maldonado, Worthington, *747 Farabelli, and Michael Cahill testified. Maldonado stated he prepared a waiver form which indicated defendant was wanted in a murder investigation, he had been advised of and understood his Miranda rights, and that he agreed to speak to the police regarding the murder for which he was a suspect. The form also contained the following question:
Are you willing to voluntarily return to Trenton[,] New Jersey to answer to the charges on you[r] own free will and with out formality/Court Hearing in this jurisdiction at this time?
Defendant's response to this question on the form was yes. Further, Maldonado testified he read the waiver form to defendant in Spanish and explained he had the right to appear before a magistrate and contest extradition. Additionally, Maldonado testified he told defendant he did "not have to come with us, that he had the right to go in front of a hearing and to not come with us and he indicated that he was willing to come."
The trial judge credited Maldonado's testimony. In finding defendant waived extradition, the judge considered all of the circumstances surrounding the signingdefendant waived his rights after Miranda warnings, Maldonado explained those rights in Spanish, and defendant cooperated with the police. Maldonado concluded defendant was fully informed of:
his rights and he was fully informed of the right to waive or not waive those rights and he chose to waive and speak with the Detective; [and] that was predicated upon a knowing, understanding, voluntary waiver of his rights at that time.
We are satisfied there was sufficient credible evidence to support the judge's findings that defendant knowingly and voluntarily waived extradition. State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999). Defendant was informed of his right to have a hearing and voluntarily waived that right. Consequently, the trial judge properly denied defendant's motion to suppress.
Beyond that, even if we were to conclude defendant's waiver of extradition was invalid, we would find it was harmless and did not invalidate his confessions. First, while at the Philadelphia police headquarters defendant was advised of his Miranda rights by Maldonado and voluntarily and knowingly waived his rights. Defendant then discussed how they planned the robbery and admitted he held a shotgun and robbed the victim. This statement was freely given and occurred prior to any reference to extradition. Secondly, with regard to the statement given in Trenton, we find no violation of defendant's constitutional rights which would justify suppression of his confession. Defendant was again advised of his Miranda rights by Maldonado and voluntarily gave a statement. While in Philadelphia, if he had chosen to go to a hearing before a Pennsylvania judge, he could have either waived extradition and returned to New Jersey or be committed to jail to await the issuance of a warrant from the Governor of New Jersey and formal extradition to New Jersey. In the latter event, bail would not have been authorized since defendant was a murder suspect and a risk of flight as evidenced by his arrest at the airport. Thus defendant was not deprived of any liberty interest under the due process clause to justify suppression of the statement given in New Jersey.

II
Defendant contends the trial judge erred in admitting testimony under the coconspirator exception to the hearsay rule. Specifically, he objects to Perez's testimony that Figueroa told her how Figueroa *748 was injured which implicated defendant in the crime. Defendant urges the statement was not made "in the course of the conspiracy" and it was not made "in furtherance of the conspiracy."
Under the co-conspirator exception to the hearsay rule, evidence is admissible against a defendant if it is "a statement made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan." N.J.R.E. 803(b)(5).[1] Three conditions must be met in order for a statement to be admitted under this rule: (1) it "must have been made in furtherance of the conspiracy"; (2) it "must have been made during the course of the conspiracy"; and (3) "there must be evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it." State v. Phelps, 96 N.J. 500, 509-10, 476 A.2d 1199 (1984) (discussing the almost identical predecessor rule, Evid. R. 63(9)(b)).
The rationale for the co-conspirator exception is the belief that "[p]articipation in a conspiracy confers upon co-conspirators the authority to act in one another's behalf to achieve the goals of the unlawful scheme." State v. Harris, 298 N.J.Super. 478, 487, 689 A.2d 846 (App.Div.), certif. denied, 151 N.J. 74, 697 A.2d 546 (1997). Even though the opportunity to cross-examine is denied, the circumstances of such statements are considered to "afford a sufficient guarantee of testimonial trustworthiness." Ibid.
A statement is considered to have been made in the course of a conspiracy even when the crimes have been completed, as long as all of the conspiracy's objectives and goals have not yet been met. Id. at 488, 689 A.2d 846. In Harris, we held that a tape-recorded telephone conversation between co-conspirators concerning payment to the defendant for a murder he had committed was made in the course of the conspiracy and was admissible. Id. at 488, 689 A.2d 846. Similarly, in State v. Cherry, 289 N.J.Super. 503, 523-24, 674 A.2d 589 (App.Div.1995), we held that statements made after a murder by a coconspirator to his wife explaining her alibi role were made in the course of the conspiracy because he was scheming to conceal himself from apprehension and hide evidence.
Statements about past events are considered to be in furtherance of a conspiracy "where the statements serve some current purpose, such as to promote cohesiveness, provide reassurance to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy." State v. Taccetta, 301 N.J.Super. 227, 253, 693 A.2d 1229 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997). In Taccetta, we held tape-recorded conversations which a member of a crime organization made long ago about a different crime were admissible because they educated the hearer in the ways of the organization. Id. at 254, 693 A.2d 1229.
In State v. Hunt, 115 N.J. 330, 367, 558 A.2d 1259, reconsideration denied, 117 N.J. 152, 564 A.2d 873 (1989), the Court said that a co-conspirator's statement to a witness that the defendant had just killed a man on the sixth floor might have been made to obtain the witness's help in disposing of the evidence of the murder (the defendant then asked her to get the garbage *749 bags in which they disposed of his blood-stained clothes and knives), although it might also have been made in response to the witness's inquiry about the defendant's identity and the reason he was in the co-conspirator's apartment. Despite the dual possible meanings of the statement, the Court concluded the trial court did not abuse its discretion in ruling the statement was made during the course of and in furtherance of a conspiracy to hinder apprehension. Id. at 367-68, 558 A.2d 1259. The Court held the error was harmless due to the witness's questionable credibility and the overwhelming proof of the defendant's guilt. Id. at 368-69, 558 A.2d 1259.
Applying these principles here, Perez testified about her first visit to Timmy's house to see Figueroa and stated Figueroa asked her to go to her aunt's house and return with some clothing she needed. At this point defense counsel requested a sidebar. He sought to have Perez precluded from testifying to anything Figueroa told her about defendant's involvement in the robbery. The trial judge rejected the request, noting that Perez had been summoned by one co-conspirator to see another co-conspirator who was lying injured after the crime. The judge explained "they're in the aftermath of the conspiracy and attempt to avoid detection, arrest and prosecution, and that is in furtherance of the conspiracy." Defense counsel then informed the judge of the expected testimony from the witness by reading a portion of Perez's statement to the police. There, Perez said that when she returned with Figueroa's clothes, her friend told her that she, defendant, and two other guys were going "to rob somebody, and that something went wrong and she got shot. And she showed me a patch on her leg." Perez asked Figueroa if she needed to go to the hospital, but she refused. The judge overruled defense counsel's objection to the testimony stating:
I find without any doubt that this conspiracy was not terminated. The conspiracy to kill, rob, and to kidnap had not been terminated. And the reason that I find that is, is that there was, among other things, that Ivelisa Figueroa, if she was wounded during this assault, this lethal assault by a shotgun, by a pellet, she is still wounded and calling for her friend to come by the house, and sends the defendant to go get her. So that is all in furtherance of the conspiracy to conceal the crime, to avoid detection, and to flee.
....
She is enlisting her friend to do things for her, because of her inability to walk and her fear that her aunt will ask her some embarrassing questions, which may lead to the crime coming to light. And [defendant] was sent, dispatched by Ivelisa Figueroa, go get my girlfriend, AnnMarie, and that was in furtherance of the conspiracy.
At which time she goes and is concerned about her, and she, in order to enlist her aid, AnnMarie Perez' aid, she is telling her why she has to do these things. Why she had to come quickly. And I find all those are in furtherance of the conspiracy.
Perez subsequently testified consistent with the testimony defense counsel sought to exclude.
To be sure, at the time Figueroa's statements were made to Perez the crime was over, but not the attempt to avoid apprehension. The inquiry is whether Figueroa's statements were made in furtherance of the conspiracy. The first statement to Perez where she requested clothes was in furtherance of the conspiracy to evade capture. This statement did not implicate defendant and counsel did not *750 object to it. The second statement, however, explained how Figueroa was shot during the robbery and clearly implicated defendant. At this time, Figueroa was not asking Perez to do anything else for her, and Figueroa refused Perez's offer to take her to the hospital. While this is a much closer case, in our view the second statement was not made in furtherance of the conspiracy. Thus, the second statement did not satisfy all three requirements of the co-conspirator exception and should have been excluded.
Although we find that Perez should not have been permitted to testify that Figueroa told her defendant was involved in the robbery where she was injured, we must determine whether the admission of that hearsay testimony was "harmless error in view of the other similar proofs before the jury." State v. Federico, 198 N.J.Super. 120, 131, 486 A.2d 882 (App.Div.1984), aff'd, 103 N.J. 169, 510 A.2d 1147 (1986). We are convinced other proof of defendant's involvement in the conspiracy to rob Maghoub was overwhelming. As noted defendant gave at least two confessions admitting his involvement in the robbery. Furthermore, Timoteo gave a statement to the police that he overheard defendant and the others bragging about the incident. Thus, we conclude the admission of Perez's hearsay testimony was cumulative and played a minor role in the trial. Any error in admitting Perez's statement was clearly harmless. State v. Hunt, supra, 115 N.J. at 368-69, 558 A.2d 1259.

III
Defendant contends the trial judge erred in admitting Timoteo's statements to the police as substantive evidence rather than merely as prior inconsistent statements. He contends the judge erred in finding the circumstance surrounding the statements had sufficient indicia of reliability and that Terron's testimony to the contrary was not credible.
N.J.R.E. 803(a)(1) provides in part:
The following statements are not excluded by the hearsay rule:
(a) Prior statements of witnesses. A statement previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:
(1) is inconsistent with the witness' testimony at the trial or hearing and is offered in compliance with Rule 613. However, when the statement is offered by the party calling the witness, it is admissible only if, in addition to the foregoing requirements, it (A) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability....
Thus, prior inconsistent statements may be admissible as substantive evidence if they are inconsistent with a witness's testimony and, if offered by the party calling the witness, are sound-recorded or in writing made or signed by the witness. State v. Mancine, 124 N.J. 232, 247, 590 A.2d 1107 (1991); State v. Gross, 121 N.J. 1, 7-9, 577 A.2d 806 (1990).
When a witness claims he or she cannot remember the events that he or she gave a previous statement, the trial judge may consider this a feigned loss of memory and admit the statements under N.J.R.E. 803(a)(1). State v. Brown, 138 N.J. 481, 544, 651 A.2d 19 (1994) overruled on other grounds by State v. Cooper, 151 N.J. 326, 700 A.2d 306 (1997). The jury is free to believe the version of the events in the statement or the version presented at trial (even though witness's inability to *751 remember event suggests it may never have occurred). Id. at 542, 651 A.2d 19. Although the judge, in admitting the statement, is essentially making a finding that the feigned memory loss is a lie, the jury is able to observe the witness and make its own decision about which account is true. Id. at 544, 651 A.2d 19.
In Gross, the Court agreed with the fifteen factors we articulated for proper evaluation of the reliability of a prior inconsistent statement:
(1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion of the summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement, and (15) the presence or absence of corroborating evidence.
[State v. Gross, supra, 121 N.J. at 10, 577 A.2d 806 (quoting State v. Gross, 216 N.J.Super. 98, 109-10, 523 A.2d 215 (App.Div.1987)).]
The determination of the reliability of the statement, based upon all of the relevant factors, should be made out of the presence of the jury. Gross, supra, 216 N.J.Super. at 110, 523 A.2d 215. The proponent of the statement has the burden of proving by a preponderance of the evidence it is reliable. Gross, supra, 121 N.J. at 15, 577 A.2d 806.
Here, Timoteo testified before the jury he was drunk and on drugs on January 30, 1996, the night Figueroa was brought to his son's house, and aside from trying to help the injured woman and the general commotion, he did not remember much about it. When confronted with his statements to the police on February 2, 1996, and to the prosecutor on December 10, 1997, which implicated defendant in the robbery, Timoteo said he told the police only what they wanted to hear. Timoteo claimed the police used coercion, threats, and sympathy tactics to influence him to sign the statement and the words in the statements were suggested to him by the police and the prosecutor. Timoteo testified that on the day of his first statement, the police came to his son's house and took him to the police station for questioning. He said they placed him in a room alone for an hour until Nawrock arrived to take his statement. He claimed Nawrock held statements taken from his two sons and after each question, he would say this is what Timmy answered. Timoteo claimed, Nawrock said if you want him to come home with you, this is what you have to say.
The State offered Worthington to counter this testimony. Worthington stated he interviewed Timoteo twice before the December 10, 1997, interview. On that day, Worthington said Timoteo drove himself to the Mercer County Prosecutor's Office for the interview, and when he started to discuss the case he spontaneously erupted in *752 tears. Worthington said he never threatened to charge Timoteo as an accomplice and that Timoteo freely gave his statement.
The judge held a Gross hearing after the prior inconsistent statements were heard by the jury, but before he instructed the jury on how to use the testimony. At the hearing Worthington repeated his trial testimony and noted that several other people were in the room during Timoteo's December 10, 1997, statement (a clerk typist, another detective, and an assistant prosecutor). Worthington said that after Timoteo gave inconsistent answers from his previous testimony Worthington asked him why. Worthington said that Timoteo began to cry. Timoteo then claimed he was afraid of defendant and Robles and was fearful they would kill him. Worthington reassured Timoteo the police would protect him. At that point Timoteo gave a written statement, consistent with his original statement, and Worthington signed as a witness to the statement.
Nawrock testified about the circumstances surrounding the first statement. He said Terron had already spoken to the police about the investigation by the time he went to the house and he asked Timoteo to accompany him to the police station. They drove in an unmarked police car to the station. Nawrock testified Terron was not under arrest and did not appear intoxicated. Nawrock denied bringing Timmy's and Elvis's statements into the interview room or threatening to charge Timoteo with hindering apprehension. Timoteo testified consistent with his trial testimony and claimed the police coerced him into giving his statement.
The trial judge found Timoteo lacked credibility and found Nawrock and Worthington to be very credible. He found Timoteo was not coerced into giving the statements and the statements were freely given. In finding the December 10, 1997 statement reliable, the judge noted Timoteo brought himself to the prosecutor's office, was not in custody or a target of an investigation, did not appear to be intoxicated, there were other people present when the statement was given, and Timoteo signed the statement in front of witnesses understanding what it was going to be used for. The judge found there was corroborating evidence and that the statements were reliable by clear and convincing evidence.
We are satisfied the trial judge's factfindings are supported by sufficient credible evidence in the record. We must defer to his credibility determinations. State v. Locurto, supra, 157 N.J. at 470-71, 724 A.2d 234. Although it would have been preferable for the Gross hearing to take place prior to the admission of the statements, the result is the same. The prior inconsistent statements were properly admitted under N.J.R.E. 803(a)(1)(A).

IV
Defendant contends his sentence was excessive. First, he contends the trial judge erred in failing to merge the robbery and kidnapping convictions into the felony murder conviction, as he did with the burglary conviction, because there was no way to determine which of the three alternative predicate felonies the jury found to be the predicate felony. Second, he contends the sentence was excessive because the trial judge erroneously found the seriousness of harm to the victim as an aggravating factor, which double-counted the victim's death, an element of the offense, and failed to find the mitigating factor of his lack of any prior criminal history. We note that defendant was sentenced to concurrent terms on all of his convictions. Thus, any asserted error as to merger has no effect on his aggregate term.
*753 Defendant first argues that the robbery and kidnapping convictions were alternative bases for the felony murder, and thus should have merged with the felony murder conviction, just as the burglary conviction did when the court found it to be the predicate felony. In State v. Manning, 234 N.J.Super. 147, 164, 560 A.2d 693 (App.Div.), certif. denied, 117 N.J. 657, 569 A.2d 1351 (1989), we held that where two felonies were committed in the context of a felony murder, only the one that is considered the predicate felony merges with it; the other survives for sentencing purposes. We noted there was a dispute as to whether the robbery or the escape should be the predicate felony, but it was of no consequence because the State was willing to accept the lesser offense as the surviving conviction. Ibid.
"[J]urors need not always be unanimous on the theory of guilt, provided they are unanimous in the finding of guilt of the offense charged." State v. Harris, 141 N.J. 525, 562, 662 A.2d 333 (1995). In Harris, although the Court thought a unanimity instruction might have been useful where each of the felonies alleged as predicates for the felony murder involved distinct acts, it was not required "in light of the jury's unanimous findings of guilt of each of the predicate felonies and in light of the absence of a request for a specific unanimity charge." Id. at 563, 662 A.2d 333. (Merger was not an issue in the case.) But see State v. Pantusco, 330 N.J.Super. 424, 444, 750 A.2d 107 (App. Div.), certif. denied, 165 N.J. 527, 760 A.2d 781 (2000), (the jury was not asked to indicate from which of the series of robberies the defendant was fleeing when an accident resulting in the death of an innocent motorist occurred and we ordered merger of all predicate felonies.)
Here, the jury convicted defendant of all three predicate crimesthe robbery, the burglary, and the kidnappingand defendant did not request a unanimity charge. Consequently, we find no error in the trial judge sentencing defendant separately for the two crimes for which he was convicted which were not designated the predicate felony. State v. Manning, supra, 234 N.J.Super. at 164, 560 A.2d 693.
As to the aggravating and mitigating factors, we may not second-guess a trial judge's findings on aggravating and mitigating factors if they are supported by substantial evidence in the record. State v. Kromphold, 162 N.J. 345, 355, 744 A.2d 640 (2000); State v. Roth, 95 N.J. 334, 364-65, 471 A.2d 370 (1984). However, where the Legislature has already taken certain aspects of the nature and circumstances of the offense into account in grading, the judge may not consider those same aspects again as aggravating factors. State v. Pineda, 119 N.J. 621, 627-28, 575 A.2d 855 (1990). See, e.g., Kromphold, supra, 162 N.J. at 356, 744 A.2d 640 (where intoxication was the basis of recklessness, defendant's extreme intoxication could not be used as an aggravating factor); State v. Boyer, 221 N.J.Super. 387, 405-06, 534 A.2d 744 (App.Div.1987), certif. denied, 110 N.J. 299, 540 A.2d 1280 (1988) (death of victim cannot be used in sentence for murder but can be used for weapons charge). Nevertheless, the cruel manner of an attack can be considered an aggravating factor. Roth, supra, 95 N.J. at 367, 471 A.2d 370. See also State v. Lewis, 223 N.J.Super. 145, 153, 538 A.2d 399 (App.Div.), certif. denied, 111 N.J. 584, 546 A.2d 510 (1988) (the "painful, dreadful" killing of a child by fire can be considered could be considered an aggravating factor).
Here, the trial judge found four aggravating factors: (1) the nature and circumstances of the offense, N.J.S.A. 2C:44-1(a)(1); (2) the gravity and seriousness of *754 the harm inflicted on the victim, N.J.S.A. 2C:44-1(a)(2); (3) the risk that defendant would commit another offense, N.J.S.A. 2C:44-1(a)(3); and the need to deter him and others from violating the law, N.J.S.A. 2C:44-1(a)(9). The judge gave defendant's lack of any prior criminal history no weight, "the weight of a feather," and found the four aggravating factors overwhelmed the non-existent mitigating factors.
In discussing the first two aggravating factors, the judge stated that this was not just "a shooting where the victim dies, boom in the old movies. This was brutal, and it went on for a long time.... [T]he moments from the time he knew you were there, until the time he expired, are unimaginable to me." Earlier the judge had described in great detail the circumstances surrounding Maghoub's death. It is clear the trial judge based his finding of the first two aggravating factors on the brutal circumstances surrounding the victim's suffering. Under these circumstances, the vicious attack upon the victim could properly be considered an aggravating factor. We find no basis to conclude it was an abuse of discretion to consider these two aggravating factors.
Further, a trial judge's consideration of mitigating factors is discretionary. State v. Setzer, 268 N.J.Super. 553, 567-68, 634 A.2d 127 (App.Div.1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994). A trial judge may give minimal weight to a defendant's lack of a previous record if he or she explains the reason for doing so. State v. Copling, 326 N.J.Super. 417, 439-40, 741 A.2d 624 (App.Div.1999), certif. denied, 164 N.J. 189, 752 A.2d 1290 (2000) (the defendant was nineteen when he committed the crime and therefore had been an adult only a short time).
Here, the trial judge noted that while defendant did not have a criminal record, he had only been in the country for three years. Further, defendant was twenty-three years old at the time of the murder. Thus, the judge satisfactorily explained why he did not consider this mitigating factor. Nevertheless, even if the trial judge should have considered this mitigating factor, the four aggravating factors clearly outweighed the one mitigating factor and would not have altered the sentence.

V
We consider defendant's pro se arguments together. Defendant lists eight alleged trial errors and contends their cumulative effect deprived him of a fair trial. Three of the errorsthe third, sixth, and seventhare discussed in Points II and III, above. The remaining five alleged errors concerning Maldonado's translating for defendant, the jury instructions regarding out-of-court statements, and the jury instruction on the inference to be accorded defendant's use of a false name, are without merit and require no further discussion. R. 2:11-3(e)(2).
We turn now to defendant's contention that the evidence does not support his conviction for kidnapping. Specifically, defendant claims there was no removal or confinement of Maghoub to facilitate the robbery to justify a kidnapping conviction.
The State properly notes that defendant is making a weight of the evidence argument and that, under R. 2:10-1, "the issue of whether a jury verdict was against the weight of the evidence shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court." Nevertheless, we may consider the merits of such an argument in the interest of justice even though defendant did not move for a new trial. State v. *755 Smith, 262 N.J.Super. 487, 511, 621 A.2d 493 (App.Div.), certif. denied, 134 N.J. 476, 634 A.2d 523 (1993). Although defendant made a motion for judgment of acquittal, he limited it to the purposeful and knowing murder charge. Thus, we must analyze the issue under the plain error standard. R. 2:10-1; State v. Wright, 155 N.J.Super. 549, 552, 383 A.2d 122 (App.Div.1978).
Defendant was convicted of first degree kidnapping, N.J.S.A. 2C:13-1(b). The statutory definition of that crime is:
A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:
(1) To facilitate commission of any crime or flight thereafter;
(2) To inflict bodily injury on or to terrorize the victim or another;
(3) To interfere with the performance of any governmental or political function; or
(4) To permanently deprive a parent, guardian or other lawful custodian of custody of the victim.
[N.J.S.A. 2C:13-1(b) (emphasis added).]
To support a conviction for kidnapping, the confinement must be "`criminally significant in the sense of being more than merely incidental to the underlying crime.'" State v. La France, 117 N.J. 583, 594, 569 A.2d 1308 (1990) (quoting State v. Masino, 94 N.J. 436, 447, 466 A.2d 955 (1983)). In determining whether confinement is more than incidental, the jury must be instructed to look beyond the duration of the confinement to the "enhanced risk of harm resulting from the confinement and isolation of the victim...." Ibid. It is the enhanced risk of harm that makes the confinement more than merely "ancillary to the crime that was its purpose." State v. Lyles, 291 N.J.Super. 517, 526, 677 A.2d 1137 (App. Div.1996), certif. denied, 148 N.J. 460, 690 A.2d 607 (1997).
The cases on confinement focus on the enhanced risk of harm rather than on the duration of confinement. For example, in State v. Bryant, 217 N.J.Super. 72, 80-81, 524 A.2d 1291 (App.Div.), certif. denied, 108 N.J. 202, 528 A.2d 24, cert. denied, Bryant v. New Jersey, 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987), where in four separate burglaries, elderly victims were bound and gagged and left that way after the defendant fled. The court said their restraint during the burglaries did not make the victims more vulnerable to harm, but their confinement to facilitate the defendant's flight did increase the risk to the victims. There was no one to help them if they had difficulty breathing or suffered a heart attack. Id. at 81, 524 A.2d 1291. The evidence showed that one of the victims freed himself after ten minutes, but there was no evidence of how long it took the other victims to free themselves after the robbers left. Id. at 80, 524 A.2d 1291. In La France, supra, 117 N.J. at 591-93, 569 A.2d 1308, the Court held the elements of kidnapping were met where the defendant tied up a man in his bedroom for at least thirty minutes while he sexually assaulted the man's wife in another room as the confinement enhanced the terror of the victims. However, in Lyles, supra, 291 N.J.Super. at 527-28, 677 A.2d 1137, we held the force or coercion used by the defendant in committing sexual assault was an element of the rape for which he was convicted and did not put the victim at risk of any other more serious crime. Thus, we held there was insufficient evidence to support a conviction for kidnapping.
*756 Here, the only evidence presented at trial which described the actual crime was defendant's confessions. Defendant said he walked in the rear door of the house and saw Maghoub sitting on the couch with Figueroa. He "racked" a round into the shotgun chamber and told Maghoub not to move. Maghoub immediately began screaming and jumped at defendant, grabbing the shotgun. They wrestled for control of the shotgun in the living room and into the front hallway, where they fell on the floor, both of them still holding the gun. In the midst of the struggle, Elvis put duct tape over Maghoub's mouth and Robles pulled the shotgun away and started hitting Maghoub with its butt. The struggle and attack ultimately ended in Maghoub's death.
In our view this evidence does not support a conviction for kidnapping. Although defendant told Maghoub not to move, he did not listen. The two men immediately entered into a struggle that ended in Maghoub's death. There was no confinement for a substantial period, or anything that enhanced the risk to the victim. Whatever brief period of time Maghoub may have been confined was merely incidental to the other crimes for which defendant was convicted: the burglary, robbery, aggravated assault, and felony murder. Lyles, supra, 291 N.J.Super. at 528, 677 A.2d 1137. It was error to submit the kidnapping charge to the jury. We reverse the kidnapping conviction.

VI
We reverse defendant's kidnapping conviction and remand to modify the sentence. In all other respects, we affirm the conviction and sentence.
NOTES
[1] N.J.R.E. 803(D)(5) replaced rule 63(9)(b) with almost identical language. State v. Taccetta, 301 N.J.Super. 227, 251, 693 A.2d 1229 (App.Div.) certif. denied, 152 N.J. 187, 704 A.2d 17 (1997).