790 A.2d 921 (2002)
347 N.J. Super. 457
STATE of New Jersey, Plaintiff/Respondent,
v.
Lester DENMON, Defendant/Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 4, 2001.
Decided February 6, 2002.
*923 Peter Garcia, Acting Public Defender of New Jersey, attorney for appellant, (Philip Lago, Designated Counsel, of counsel and on the brief).
John J. Farmer, Jr., Attorney General of New Jersey, attorney for respondent, (Russell J. Curley, Deputy Attorney General, of counsel and on the brief).
Before Judges WALLACE, Jr., CARCHMAN and WELLS.
*922 The opinion of the court was delivered by WALLACE, Jr., J.A.D.
Defendant Lester Denmon was convicted by a jury of first degree kidnapping, N.J.S.A. 2C:13-1b (counts one and two); first degree armed robbery, N.J.S.A. 2C:15-1 (count three); second degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a (count four); third degree unlawful possession of a weapon, a hand gun, N.J.S.A. 2C:39-5b (count five); fourth degree credit card theft, N.J.S.A. 2C:21-6c (count six); third degree fraudulent use of credit cards, N.J.S.A. 2C:21-6h (counts eleven, fourteen and seventeen); third degree theft by deception, N.J.S.A. 2C:20-4 (count eight); fourth degree forgery, N.J.S.A. 2C:21-1a(2) (counts twelve, fifteen and eighteen); fourth degree forgery by uttering a writing, N.J.S.A. 2C:21-1a(3) (counts thirteen, sixteen and nineteen); fourth degree unlawful possession of a weapon, an ice pick, N.J.S.A. 2C:39-5d (count twenty); and fourth degree certain persons not to have weapons N.J.S.A. 2C:39-6A (count twenty-one).
Defendant's motion for judgment of acquittal or a new trial was denied on March 17, 2000. The judge granted the State's motion to impose an extended term and imposed a concurrent extended sentence of forty years with twenty years of parole ineligibility on counts one and two. The judge imposed concurrent sentences on the remaining counts.
On appeal, defendant makes the following arguments in his main brief.
POINT I:
THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A MISTRIAL ON THE BASIS OF GRATUITOUS, PREJUDICIAL REMARKS MADE BY A STATE WITNESS.
POINT II:
THE LOWER COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL N.O.V. AND FOR A NEW TRIAL.
POINT III:
THE SENTENCING COURT ERRED IN IMPOSING AN EXTENDED TERM SENTENCE.
POINT IV:
THE SENTENCE IMPOSED BY THE COURT IS EXCESSIVE.
Defendant makes the following arguments in his pro se supplemental brief.
POINT I:
THE PROSECUTOR FAILED TO DISCLOSE EXCULPATORY EVIDENCE PURSUANT TO BRADY V. MARYLAND BY FAILING TO PROVIDE THE IDENTITY OF THE OWNERS OF BOTH THE LICENSE PLATE AND VEHICLE AND SUPPRESSION AND CONCEALMENT OF DECLARANT CHESTER'S PROBATIONARY STATUS AND TRAFFIC WARRANT.
POINT II:
THE COURT ABUSED ITS DISCRETION IN SUBSTITUTING JUROR ABSENT COMPELLING CIRCUMSTANCES ONCE DELIBERATIONS *924 HAD COMMENCED, THUS VIOLATING DEFENDANT'S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY.
POINT III:
THE DEFENSE COUNSEL NEGLIGENCE IN THIS CASE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.
We have carefully considered these arguments and, with the exception of a sentencing matter, we conclude the arguments are without merit and affirm. R. 2:11-3(e)(2).
The State presented evidence to show that in February 1997, defendant discussed with James Chester a plan to rob the home of James and Ethel Scott. Defendant told Chester he had worked at the Scotts' house in the past and believed the elderly couple kept a lot of money in a suitcase.
On March 1, 1997, defendant, along with Chester, drove his red Cadillac and parked it down the street from the Scotts' home. He gave Chester a gun and a set of handcuffs and instructed Chester to handcuff the couple before leaving the home. Chester knocked on the door. When James opened the door, Chester said he needed to use the telephone to call a tow truck for his car. James suggested that Chester call Triple A and invited him in the house. James went to his bedroom to look up the phone number while his wife Ethel escorted Chester into their home. When James returned with the telephone number, Chester pulled a gun, and said, "I don't want to hurt you. I just want your money." James replied that they did not keep money in the house. Chester then moved the couple into the bedroom where he removed $40 in cash and a Visa gold credit card from James's wallet. Chester next ordered the couple into the living room, where he handcuffed James to Ethel while they sat in a chair. Chester fled the house and returned to the car where defendant waited.
Once Chester left, the Scotts tried to get out of the chair, but were unable to do so because Ethel had recently had knee replacement surgery which made it difficult for her to maneuver. After struggling for over five minutes, James managed to get to the telephone and call the police.
Meanwhile Chester was upset with defendant due to the little money he found in the Scotts' home. Defendant drove to a Bradlees Department store where they purchased a TV, a VCR and a cell phone using James' credit card. The total sale was $572. Defendant signed James' name on the credit card record. Next the two men stopped at a liquor store and purchased several bottles of liquor and cigarettes, again using James' credit card. Defendant signed James' name on the receipt for the $200 purchase. Next the two purchased gasoline and oil with the same credit card. The gas station attendant wrote down the license plate of defendant's car which was ADF-7428. They then went to Pathmark Supermarket and purchased groceries with James' credit card. Their final attempt to use the credit card was at a clothing store, but the card was declined by the store. Defendant and Chester later sold the TV, VCR and cell phone for $90.
Meanwhile Detective Mark Fisco of the Teaneck Police Department was dispatched to the Scott home where the Scotts explained what had occurred. Detective Fisco then called the credit card company and canceled James' credit card. He inquired about recent purchases made with the card and learned of the Bradlees, Pathmark, gas station and liquor store purchases. The police traveled to each of these locations and retrieved the credit card receipts. The receipts contained *925 James' credit card along with his forged signature.
Several days later, Detective Fisco and Detective Andrew McGurr were in the Bradlees' parking lot when they observed a red Cadillac bearing the same license plate number involved in the improper use of James' credit card. Detective McGurr observed defendant enter the Cadillac. The police then stopped the vehicle and arrested defendant. A search of the car revealed several bottles of liquor and two quarts of oil. Later, Detective Fisco showed various witnesses a photographic array which included defendant's picture. The Bradlees cashier identified defendant as the purchaser of the TV and VCR. In addition, Nicole Thompson, a locksmith, who had previously helped defendant several weeks before when defendant locked his keys in the car while the car was parked outside of the Scotts' home, identified defendant as the man at the Scotts' home on that occasion.
In February 1998, Detective Fisco learned that Chester was a possible suspect in the March 1997 incident at the Scotts' home. Chester was arrested a short while later and agreed to give a statement. He detailed the robbery events and the subsequent use of the credit card. Prior to defendant's trial, Chester agreed to plead guilty to one count of first degree robbery and one count of theft by deception for his part in the Scott incident and agreed to testify against defendant.
At trial Chester testified about the events surrounding the robbery. He stated he met defendant in 1986 when they were in prison together. He admitted his involvement with defendant in the robbery, and his testimony corroborated the Scotts' recollection of the incident. He also testified that he and defendant made several purchases with James' credit card.
Defendant testified on his own behalf and denied any involvement. He also denied doing any repair work on the Scotts' home. Defendant claimed that Chester testified against him as revenge for defendant informing jail authorities that Chester was smuggling illegal drugs into the jail while they were previously jailed on unrelated charges.

I
Defendant contends the trial judge erred in denying his motion for a mistrial on the basis of gratuitous, prejudicial remarks made by a State witness.
During direct examination, Chester was asked about his relationship with defendant. In response to the prosecutor's inquiry concerning how frequently he spoke to defendant in 1986, Chester replied quite a few timesbecause he and defendant were "locked in the same barracks." Following objection and argument to the trial judge, defendant sought a mistrial. The judge denied the motion and gave a curative instruction to the jury. The judge then instructed the jury to "totally disregard Chester's answer" to the last question and directed the jury not to consider it in deciding defendant's guilt or innocence.
The decision on whether inadmissible evidence may be cured by a cautionary or limiting instruction or instead requires the more severe response of a mistrial "is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." State v. Winter, 96 N.J. 640, 646-47, 477 A.2d 323 (1984). Thus, a motion for a mistrial is addressed to the sound discretion of the trial judge. Ibid.
*926 Here, the judge determined that a curative instruction could solve the problem with the inadmissible evidence. The judge then gave a clear instruction for the jury to totally disregard Chester's response and not to consider it at all in judging the evidence. We find nothing in the record to support the view that the jury failed to heed the judge's instruction. Nor do we find any abuse of discretion in the judge's determination to cure the problem with an instruction. In short, we find no error in the denial of defendant's motion for a mistrial.

II
Defendant timely moved for a judgment of acquittal or for a new trial contending that the verdict of guilty on the first-degree kidnapping was against the weight of the evidence. He makes the same argument on appeal. Specifically, defendant argues that his conduct was not first degree kidnapping because the victims were not confined for a substantial period of time and were released unharmed and in a safe place.
N.J.S.A. 2C:13-1b provides:
A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:
1) To facilitate commission of any crime or flight thereafter.
2) To inflict bodily injury on or to terrorize the victim or another; or
3) To interfere with the performance of any governmental or political function.
Recently, in State v. Soto, 340 N.J.Super. 47, 73-4, 773 A.2d 739 (App. Div.2001), we noted that "[t]o support a conviction for kidnapping the confinement must be `criminally significant in the sense of being more than merely incidental to the underlying crime.'" (quoting State v. LaFrance, 117 N.J. 583, 594, 569 A.2d 1308 (1990)(quoting State v. Masino, 94 N.J. 436, 447, 466 A.2d 955 (1983)). The determination of whether the confinement is substantial is not determined by its duration. Ibid. Rather, the jury should look at the "enhanced risk of harm resulting from the confinement and isolation of the victim." State v. Lyles, 291 N.J.Super. 517, 526, 677 A.2d 1137 (App.Div.1996), certif. denied, 148 N.J. 460, 690 A.2d 607 (1997).
In State v. Bryant, 217 N.J.Super. 72, 80-82, 524 A.2d 1291 (App.Div.), certif. denied, 108 N.J. 202, 528 A.2d 24, cert. denied, 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987), we found that elderly victims were substantially confined when they were bound and gagged for 10 minutes because their confinement increased the risk of harm to the victims. We explained that "[h]ad the victims been unable to free themselves for an extended period of time ..., there was a significant possibility of additional discomfort, physical injury or even death." Id. at 81, 524 A.2d 1291.
Thus, it is necessary to consider "whether the nature of the confinement and the duration of the victims' isolation made them more vulnerable to harm beyond that created by the robbery itself." Ibid. Here, the victims were in their eighties and were handcuffed to facilitate Chester's flight after the robbery. In his testimony, James explained that it was difficult to move around with the handcuffs, "because my wife, she had replacement knees and it was a little rough for her to get up faster in order to get to the door, because you see she had to walk a little backwards or sideways or so toin order for us to get there." Furthermore, *927 there was no one to help them if they had health problems while they were confined. Ibid. (explaining that "once the robbers left, there would be nobody to help the bound and gagged elderly victims, if they were unable to breathe or suffered a heart attack"). In our view, the evidence was sufficient for the jury to conclude that the conduct in handcuffing the elderly victims enhanced the risk of harm such that the elderly victims were substantially confined.
In sum, giving the State the benefit of its favorable testimony as well as all reasonable inferences, State v. Reyes, 50 N.J. 454, 459, 236 A.2d 385 (1967), we conclude that a reasonable jury could find defendant guilty of first-degree kidnapping. The jury's verdict was not a miscarriage of justice under the law. See State v. Sims, 65 N.J. 359, 373-74, 322 A.2d 809 (1974), R. 2:10-1.

III
Defendant argues that the trial judge erred in imposing an extended term sentence and the sentence imposed was excessive. We disagree.
The trial judge properly found that defendant was eligible to be sentenced as a persistent offender pursuant to the provisions of N.J.S.A. 2C:44-3a. This statute provides that a sentencing court may impose an extended term on individuals who qualify as persistent offenders. The Code defines a persistent offender as an individual who "at the time of the commission of the crime is 21 years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least eighteen years of age...." N.J.S.A. 2C:44-3a.
When imposing a discretionary extended sentence, the trial judge must follow the multi-step process set forth in State v. Dunbar, 108 N.J. 80, 527 A.2d 1346 (1987). There, the Supreme Court explained that:
First, the sentencing court must determine whether the minimum statutory predicates for subjecting the defendant to an extended term have been met. Second, the court must determine whether to impose an extended sentence. Third, it must weigh the aggravating and mitigating circumstances to determine the base term of the extended sentence. Finally, it must determine whether to impose a period of parole ineligibility.

[Id. at 89, 527 A.2d 1346].
Here, the trial judge found that defendant was a persistent offender under the terms of N.J.S.A. 2C:44-3a, and defendant does not dispute this findings. Rather, defendant urges that his lesser role in the commission of the offense does not justify an extended term sentence.
We are satisfied that the sentence complied with the provisions of the New Jersey Code of Criminal Justice. The trial judge thoroughly analyzed and weighed the aggravating factors, against the absence of any mitigating factors. In determining that the aggravating factors substantially outweighed the non-existent mitigating factors, the trial judge precisely articulated the aggravating factors of (1) the nature and circumstances of the offense, N.J.S.A. 2C:44-1a(1); (2) the risk that defendant would commit another offense, N.J.S.A. 2C:44-1a(3); (3) defendant's prior record, N.J.S.A. 2C:44-1a(6); (4) the need to deter defendant and others, N.J.S.A. 2C:44-1a(9); and (5) a crime against elderly people, N.J.S.A. 2C:44-1a(12) to justify the imposition of a forty-year sentence with twenty years of parole ineligibility.
While we harbor some concern regarding the finding of the nature and circumstances of the offense, we perceive no *928 basis to disturb the quantum of the sentence imposed or the parole ineligibility term set. Our sentencing statute contemplates a thoughtful weighing of the aggravating and mitigating factors, not a mere counting of one against the other. State v. Scher, 278 N.J.Super. 249, 273, 650 A.2d 1012 (App.Div.1994), certif. denied, 140 N.J. 276, 658 A.2d 299 (1995). The judge expressed that he placed great weight on defendant's four felony convictions and fifteen arrests. Thus, even excluding the aggravating factor of the nature and circumstances of the offense, the record supports the imposition of an extended sentence. Accordingly, the extended sentence does not represent a miscarriage of justice and does not shock the judicial conscience. State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989).
We add one additional sentencing point. The law is clear that in imposing a discretionary extended term sentence, the sentencing judge may only impose one extended term. State v. Pennington, 154 N.J. 344, 361, 712 A.2d 1133 (1998), N.J.S.A. 2C:44-5a(2). Here, the judge imposed extended term sentences on both kidnapping convictions. Consequently, we must remand to the Law Division for the entry of an amended sentence to provide for only one extended term sentence.
Defendant's remaining contentions related to the State's failure to disclose evidence, the substitution of a juror, and the receipt of ineffective assistance of counsel are clearly without merit and do not require extended discussion. R. 2:11-3(e)(2).
Contrary to defendant's contention, we find no Brady violation in the State's failure to disclose that Chester had an outstanding traffic summons. Brady v. Maryland, 373 U.S. 83, 85-89, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215, 218 (1963). In order to establish a Brady violation, defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material. State v. Martini (V), 160 N.J. 248, 268-69, 734 A.2d 257 (1999). Defendant failed to satisfy the three prongs. In addition, the trial judge did not abuse his discretion in proceeding with the trial after one juror failed to appear in court on the eighth day of trial and immediately before the jury charge. The judge did not excuse the juror, but elected to proceed in the absence of one juror because there were still thirteen jurors. Ultimately, twelve jurors decided the case. Finally, we reject defendant's claim of ineffective assistance of counsel in the failure of defense counsel to request discovery concerning Chester's outstanding traffic summons. We are satisfied that defendant is unable to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984).
We remand to correct the sentence to provide only one extended term sentence. In all other respects we affirm.