**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1603-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN L. STURDIVANT 3rd,
a/k/a JOHN STURDIVANT,

     Defendant-Appellant.

_____

Argued October 28, 2021 – Decided January 14, 2022

Before Judges Whipple, Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 18-02-0115.

Alison Gifford, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alison Gifford, of counsel and on the briefs).

Dana R. Anton, Special Deputy Attorney General/ Acting Senior Assistant Prosecutor, argued the cause for respondent (Christine A. Hoffman, Acting

Gloucester County Prosecutor, attorney; Dana R. Anton, on the brief).

PER CURIAM

Defendant John Sturdivant appeals from his jury trial conviction for eluding a police officer, N.J.S.A. 2C:29-2(b). This case arises from a traffic stop for speeding, during which a motorcyclist pulled over but then abruptly fled. At trial, defendant argued that he had been misidentified by the officer who made the stop. Defendant now contends for the first time on appeal that the trial judge inadequately instructed the jury on the special dangers of misidentification associated with (1) a single photo "show up" identification procedure and (2) an eyewitness' exposure to outside information. Defendant also contends that the trial court committed plain error when it misspoke while explaining to the jury how to evaluate the officer's level of confidence in his identification, inadvertently substituting the word "competence" for "confidence."

Defendant also contends, again for the first time on appeal, that the prosecutor committed misconduct during his summation by commenting that the officer was trained to carefully observe a suspect's facial features. Defendant also claims the prosecutor, during his closing argument, impermissibly shifted the burden of proof by implying that defendant was responsible for producing

2

evidence that the motorcycle, which belonged to defendant's mother and was reported stolen, had been taken by someone other than defendant. Defendant further argues that even if any of these individual alleged errors do not require reversal, their cumulative effect casts doubt on the verdict and requires a new trial. Finally, defendant contends that the trial court imposed an excessive sentence. After carefully reviewing the record in light of the applicable legal principles, we reject these contentions and affirm the conviction and sentence.

## I.

We briefly summarize the facts pertinent to this appeal that were adduced at trial. On October 19, 2017, around 12:30 a.m., Woodbury Police Department Officer Matthew Martinez was on routine patrol when he observed a motorcycle traveling seventy-four miles per hour in a twenty-five-mile-per-hour zone. Martinez initiated a traffic stop. The motorcyclist complied at first. Martinez testified that "[o]nce he was stopped, he turned around, looked right at me, at which time I told him to shut the motorcycle off . . . [a]t which time, he, the defendant, he kind of waved his left arm or something . . . put the bike in gear, and took off on me." The motorcyclist was wearing a helmet with a visor, and when he turned around to look at Martinez, the visor was lifted. Martinez testified that he looked at the operator's face for five to six seconds. He also

3

testified that the lighting conditions "were good.  I had my overhead lights.  There's a—so I had the Wawa reflection, there was a light above, shining down, like a regular standard, like, street light post, shining down."  The encounter was recorded on a police vehicle camera, and the audio/video recording was played to the jury.

Martinez attempted to catch up to the fleeing motorcycle but was unsuccessful.  He provided the license plate number to the police dispatcher and was informed that the motorcycle was owned by Vasti Sturdivant.  Martinez recognized the name, as Vasti[1] had visited the police station a week and a half earlier to report that her motorcycle registration had been stolen.  Martinez recalled that Vasti had told him at that time that her son uses the motorcycle.[2]  Upon hearing Vasti's name from the dispatcher, Martinez "put it all together and identified [defendant]—pretty much identified him as being on that motorcycle."

Martinez went to Vasti's residence, which was less than a mile from where the aborted motor vehicle stop had occurred.  He spoke with Vasti and learned

---

[1]  Because Vasti Sturdivant shares the same last name with defendant, her son, we use her first name to avoid confusion.  We mean no disrespect in doing so.

[2]  Officer Martinez found it "odd" that Vasti did not have a motorcycle license.  Accordingly, he "dug into it a little bit and [Vasti] admitted that her son also rode the motorcycle."

4

that both the motorcycle and her son were missing.  She later reported to police that the motorcycle had been stolen.[3]

In the course of preparing a police report later that night, Martinez accessed a database containing defendant's photo-bearing drivers' license so that it could be attached to the report.  Martinez reviewed the photograph and confirmed that defendant was the person who had fled the traffic stop.  The officer's viewing of defendant's driver's license photograph occurred within "no more than two hours" of the aborted traffic stop.

In February 2018, a grand jury returned a single-count indictment charging defendant with second-degree resisting arrest/eluding, N.J.S.A. 2C:29-2(b).  Defendant was tried before a jury on three non-consecutive days in May 2019.[4]

The State presented only one witness at trial, Officer Martinez.  The defense presented testimony from Vasti and defendant's girlfriend.  The girlfriend offered an alibi defense, testifying that she was with defendant in Pennsylvania the entire night of October 18, 2017, which was her birthday.  She acknowledged on cross examination that she did not provide this information to

---

[3]  We note that defendant was not charged with motor vehicle theft.

[4]  A separate bench trial was held for the related motor-vehicle violations.

police until April 2019, a year-and-a-half after the eluding incident and only a month before the trial.

The jury found defendant guilty of the resisting arrest/eluding charge. The sentencing hearing was conducted on August 2, 2019. The trial judge imposed a state prison term of eight years with a four-year period of parole ineligibility pursuant to N.J.S.A. 2C:43-6(b).

Defendant raises the following contentions for our consideration:

POINT I

THE COURT'S FAILURE TO ACCURATELY INSTRUCT THE JURY ON HOW TO EVALUATE THE RELIABILITY OF THE OFFICER'S IDENTIFICATION OF DEFENDANT WHEN THE DEFENSE WAS MISIDENTIFICATION REQUIRES REVERSAL OF DEFENDANT'S CONVICTION. (Not raised below)

POINT II

THE PROSECUTOR'S SUMMATION IMPERMISSIBLY BOLSTERED THE STATE'S SOLE WITNESS AND SHIFTED THE BURDEN OF PROOF TO THE DEFENSE. THESE ARGUMENTS DENIED THE DEFENDANT HIS RIGHT TO A FAIR TRIAL AND REQUIRE REVERSAL OF HIS CONVICTION. (Not raised below)

A. THE PROSECUTOR'S ARGUMENT IN SUMMATION, WHICH IMPLIED THAT THE OFFICER'S VERSION OF EVENTS WAS CREDIBLE BECAUSE HE HAS SUPERIOR POWERS OF OBSERVATION, WAS

6

FACTUALLY UNTRUE, INAPPROPRIATELY BOLSTERED THE OFFICER'S CREDIBILITY, AND WAS PREJUDICIAL.

B. THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT BY IMPERMISSIBLY SHIFTING THE BURDEN OF PROOF TO THE DEFENSE.

C. THESE IMPROPER ARGUMENTS, BOTH INDIVIDUALLY AND TOGETHER, DEPRIVED DEFENDANT OF A FAIR TRIAL AND NECESSITATE REVERSAL OF HIS CONVICTION.

POINT III

THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not raised below)

POINT IV

DEFENDANT'S SENTENCE IS EXCESSIVE AND THE COURT FAILED TO EXPLAIN THE REASONS FOR ITS IMPOSITION. THEREFORE, THE SENTENCE MUST BE VACATED AND THE MATTER REMANDED FOR RESENTENCING.

Defendant also submitted a reply brief raising the following contention.

POINT I

THE TRIAL COURT DID NOT PROPERLY CHARGE THE JURY ON EVALUATING IDENTIFICATION EVIDENCE.

POINT II

THE PROSECUTOR COMMITTED REVERSIBLE
MISCONDUCT IN SUMMATION.

II.

We first address defendant's contentions regarding the adequacy of the jury instructions that the trial judge delivered. We begin our analysis by acknowledging the legal principles governing our review, starting with the bedrock precept that "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). Proper jury instructions are "crucial to the jury's deliberations on the guilt of a criminal defendant." State v. Jordan, 147 N.J. 409, 422 (1997). They provide a "road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations." State v. Savage, 172 N.J. 374, 387 (2002) (quoting State v. Martin, 119 N.J. 2, 15 (1990)).

It also is well-settled that when, as in this case, a defendant does not object to the jury charge, "there is a presumption that the charge was not error and was unlikely to prejudice . . . defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 NJ. 157, 182 (2012)). Accordingly, when, as in this case, defendant does not request a specific charge and does not

challenge the instructions that are delivered, reversal is warranted only when the alleged error is "clearly capable of producing an unjust result." R. 2:10-2; State v. Torres, 183 N.J. 554, 564 (2005). In State v. Burns, the Supreme Court re-affirmed that

> [i]n the context of a jury charge, plain error requires demonstration of "[l]egal impropriety of the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [192 N.J. 312, 341 (2007) (quoting Jordan, 147 N.J. at 422).]

Furthermore, the prejudicial effect of an omitted instruction is evaluated "in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel." State v. Marshall, 123 N.J. 1, 145 (1991) (quoting Kentucky v. Whorton, 441 U.S. 786, 789 (1979)). "Portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." Jordan, 147 N.J. at 422 (quoting State v. Wilbely, 63 N.J. 420, 422 (1973)). The effect must be considered, moreover, "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

In this case, defendant contends the jury instructions were inadequate because they failed to advise the jury on certain circumstances that have been found to increase the risk of eyewitness misidentification. The seminal case on this topic in New Jersey, if not the nation, is State v. Henderson, 208 N.J. 208 (2011). Chief Justice Rabner's unanimous opinion is supported by social science studies compiled by a Special Master appointed by the Court. Id. at 217–18. The landmark decision carefully and comprehensively examines the frailties and vulnerabilities of human perception and memory. Id. at 217. The decision examines the circumstances that can lead to misidentification, specifying various "estimator" variables (e.g., lighting conditions, distance, the length of time the witness has to observe the perpetrator, stress during an encounter, and cross-racial effects) and "system" variables (i.e., the manner in which police administered a photo array procedure) that influence a witness's ability to accurately identify a culprit. Id. at 247, 289–90. The opinion establishes best practices for police to use when administering eyewitness identification procedures. Importantly for purposes of this appeal, it stresses the need to instruct juries on the risk of misidentification, mindful that the predecessor standard for assessing eyewitness identification evidence overstated the jury's inherent ability to evaluate evidence offered by eyewitnesses who honestly

believe their testimony is accurate. Id. at 218, 296. The Court "asked the Criminal Practice Committee and the Committee on Model Criminal Jury Charges to draft proposed revisions to the . . . model charge on eyewitness identification and address various system and estimator variables." Id. at 219. Pursuant to the Court's request, a comprehensive model jury charge was drafted to explain to juries the risk of misidentification and to highlight certain specific circumstances that may affect the reliability of an identification.

Henderson did not involve an identification made by a police eyewitness. In State v. Pressley, the Court acknowledged that Henderson did not address the "intriguing question . . . [of] whether an identification made by a law enforcement officer should be tested by the same standards that apply to a civilian." 232 N.J. 587, 590–591 (2018). The Court in Pressley recognized that the United States Supreme Court's decision in Manson v. Brathwaite, 432 U.S. 98 (1977)—a seminal federal case on eyewitness identification evidence—could be read to incorporate the same standards in cases where a law enforcement officer rather than a civilian is the identifying witness. Our Supreme Court noted, for example, that, "[i]mplicit in the [Brathwaite] ruling is a simple concept: identifications by law enforcement should be examined to determine if an 'impermissibly suggestive' identification procedure was used." Id. at 591

11

(citations omitted). Both <u>Brathwaite</u> and <u>Pressley</u> involved an out-of-court identification procedure at which an undercover officer who had purchased narcotics was shown a single photo of the suspected drug dealer, rather than a multi-photo array. The United States Supreme Court in <u>Brathwaite</u> upheld the identification, but commented that, "[o]f course, it would have been better had" the undercover officer been presented "with a photographic array" with "a reasonable number of persons" who looked like the suspect. 432 U.S. at 117.

As we have noted, the Court in <u>Henderson</u> established best practices and other safeguards, including jury instructions, to be used when police administer an identification procedure. The Court did not consider whether and to what extent those best practices and safeguards apply when the eyewitness is a police officer, who may have received specialized training and may have developed expertise through experience on how to observe, recollect, and memorialize the physical traits and facial features of the suspects with whom the officer interacts. The Court in <u>Pressley</u> concluded ultimately that,

> Based on the record before us, we cannot determine whether part or all of the protections outlined in <u>Henderson</u> should apply to identifications made by law enforcement officers. We encourage parties in the future to make a record before the trial court, which can be tested at a hearing by both sides and then assessed on appeal. <u>See</u> <u>State v. Adams</u>, 194 N.J. 186, 201 (2008) (declining to adopt new standard for

admissibility of identification evidence without full record to review); <u>State v. Herrera</u>, 187 N.J. 493, 501 (2006) (same).

[232 N.J. at 592.]

In the present case, although defendant relies heavily on <u>Pressley</u> in his appeals brief, he has not attempted to make any such record. Indeed, as we have noted, at trial defendant did not object to the jury instructions now claimed to be deficient, leaving us to address his plain error arguments without the benefit of social science research of the type deemed to be so important in <u>Henderson</u> and <u>Pressley</u>.

## A.

With the foregoing general principles concerning eyewitness identifications in mind, we next address in sequence each of defendant's specific arguments concerning the eyewitness identification jury instructions that were delivered in this case. We begin with defendant's contention that Martinez's viewing of defendant's driver's license photograph while preparing his police report was tantamount to a "showup" identification procedure; thus, defendant argues, the trial judge was required to instruct the jury on the inherently suggestive nature of showups sua sponte. He argues that the trial court committed plain error by failing to read the specific portion of the Model Jury

13

Charge that pertains to showup identification procedures.[5] We reject defendant's contention for several reasons, not the least of which is that we disagree that Martinez's downloading and viewing of defendant's photo-bearing driver's

---

[5] That portion of the Model Jury Charges reads:

> **[CHARGE IN EVERY CASE IN WHICH THERE IS A SHOWUP PROCEDURE]**
>
> (4) Showups: In this case, the witness identified the defendant during a "showup," that is, the defendant was the only person shown to the witness at that time. Even though such a procedure is suggestive in nature, it is sometimes necessary for the police to conduct a "showup" or one-on-one identification procedure. Although the benefits of a fresh memory may balance the risk of undue suggestion, showups conducted more than two hours after an event present a heightened risk of misidentification. Also, police officers must instruct witnesses that the person they are about to view may or may not be the person who committed the crime and that they should not feel compelled to make an identification. In determining whether the identification is reliable or the result of an unduly suggestive procedure, you should consider how much time elapsed after the witness last saw the perpetrator, whether the appropriate instructions were given to the witness, and all other circumstances surrounding the showup.
>
> [Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. May 18, 2020).]

14

license while preparing his police report was the functional equivalent of a showup identification procedure. In the particular circumstances of this case, that jury charge was not required. Indeed, because the text of the showup model charge refers to aspects of a police-administered identification procedure that never happened in this case, reading that charge would only have confused the jury.

In Henderson, the Court explained that "[s]howups are essentially single-person lineups: a single suspect is presented to a witness to make an identification." 208 N.J. at 259. The Court found that showup identification procedures are "inherently suggestive," noting that "they fail to provide a safeguard against witnesses with poor memories or those inclined to guess, because every mistaken identification in a showup will point to the suspect. In essence, showups make it easier to make mistakes." Id. at 259–60.

"By their nature," the Court added, "showups are suggestive and cannot be performed blind or double-blind.[6] Nonetheless, as the Special Master found,

---

[6] A double-blind administrator is one who does not know who the suspect is or where the suspect's photograph is positioned in the photo array. Henderson, 208 N.J. at 248. The double-blind best practice established in Henderson removes the possibility that the officer who is administering the identification procedure will suggest to the witness, even unconsciously, which photo in the array depicts the suspect. Id. at 248–49.

A-1603-19

'the risk of misidentification is not heightened if a showup is conducted immediately after the witnessed event, ideally within two hours' because 'the benefits of a fresh memory seem to balance the risks of undue suggestion.'" Id. at 259.

In this instance, Martinez's testimony indicated that he viewed defendant's photograph within two hours of the traffic stop.[7] Accordingly, even accepting for purposes of argument the faulty premise that this was a showup identification procedure, the risk of misidentification by reviewing a single photograph was not heightened as to require the showup model jury charge.

---

[7] The following colloquy took place at trial:

> Prosecutor: How much time passed between when you actually got a look at the operator of the motorcycle's face and when you viewed the picture?
>
> Martinez:   So[,] it was maybe no more than two hours, because I had started the report, and I had to contact the judge and the warrant, and everything was completed that night.  So maybe no more than two hours.

We note that because defendant did not move for a hearing to challenge the admissibility of Martinez's identification, did not object to Martinez's testimony when it was given, and did not request the showup model jury charge or object to the eyewitness identification charge that was delivered, the trial judge had no occasion to make a finding as to when Martinez viewed the driver's license photograph in relation to his live observation of the motorcyclist during the traffic stop.

16

More fundamentally, we do not believe the circumstances in which Martinez obtained and reviewed an electronic copy of defendant's driver's license constitutes a showup identification procedure within the meaning of Henderson and Pressley.  It is true that Martinez viewed only one photograph. He was not, however, subjected to the kind of system variables that heighten the suggestiveness of a showup identification procedure.  We stress that the key issue in this case is not whether police officers are less vulnerable than civilians to the inherent suggestiveness of a true showup procedure.  Even in the absence of social science evidence, we would be prepared, if only for the sake of argument, to consider defendant's proposition that police eyewitnesses can be influenced by such suggestiveness.  Cf. Pressley, 232 N.J. at 595 (Albin, J., concurring) ("The showing of a single photograph is inherently suggestive, whether the witness is a layperson or a police officer.  Even if we accept that police officers have enhanced observational skills, common sense and our jurisprudence tell us that exposing police officers to highly suggestive identification procedures inevitably will lead to more misidentifications and more wrongful convictions.").

There is, however, a critical distinction between the circumstances in which a witness views a single photograph during a true showup identification

A-1603-19

procedure and the circumstances in which Martinez came to view a single photograph. As the Court in Henderson emphasized, one of the problems with a showup identification procedure is that by its nature, it is not possible to use a "blind" administrator. 208 N.J. at 259. Here, there was no police officer administering the showup procedure to the eyewitness.

We note that the Court presumed in its description of a showup that "a single suspect is presented to a witness to make an identification." Ibid. (emphasis added). In his concurring opinion in Pressley, Justice Albin amplified that point, noting, "[w]hen a police officer presents a witness with a single photograph of a suspect, he [or she] is 'conveying the suggestion to the witness that the one presented is believed guilty.'" Id. at 596 (citing United States v. Wade, 388 U.S. 218, 234 (1967)). Justin Albin added, "[t]he showing of a single photograph to the detective—defendant's photograph—certainly signaled to the detective that her police colleagues had 'confirmed' defendant as the drug seller." Id. at 598.

That risk of influencing a witness's out-of-court identification simply does not apply in this case because there was no "administrator" within the meaning of Henderson and Pressley. Martinez obtained defendant's driver's license as part of his own investigation and to append the driver's license to a police report.

In these circumstances, we reject the notion that this was the functional equivalent of a showup identification procedure. But we also reject the State's suggestion that Martinez's investigative technique was a "confirmatory" identification, which is not considered to be suggestive. It is true that by the time he accessed defendant's driver's license from the database, Martinez believed that Vasti's missing son was the person who was riding the motorcycle and fled from the traffic stop.[8] In that sense, the officer's review of the driver's license photograph "confirmed" his suspicion, which ripened when he first learned from the dispatcher that the fleeing motorcycle was registered to Vasti. That suspicion was bolstered when he visited her house shortly after the traffic stop and learned that her son and the motorcycle were both missing. That does

_____

[8] Martinez was asked at trial, "And just to be clear, did you know who the defendant was prior to looking up that picture?" The officer replied, "Yeah. Yes." The jury was not told, however, that Martinez had had prior interactions with defendant or a prior opportunity to view a photograph of him. During cross-examination, Martinez was asked if he had ever met defendant prior to the October 19, 2017 incident. The officer replied, "No. No." When defense counsel followed up by asking if he had ever seen defendant before, Martinez briefly alluded to an "old case," prompting an immediate objection by counsel. Counsel withdrew the question, stating "[w]e're not going to get into anything about traffic offenses." We note that because defendant did not ask for a Wade/Henderson hearing and neither party requested an N.J.R.E. 104 hearing outside the presence of the jury, the record does not indicate whether, in fact, Martinez had ever previously reviewed a photograph of defendant. As we explain when we discuss defendant's sentencing argument, defendant has a prior robbery conviction and has had other interactions with law enforcement.

not mean, however, that this situation falls under the rubric of a "confirmatory identification" as that term is used in our eyewitness identification jurisprudence. In Pressley, the Court explained, "[a] confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name." 232 N.J. at 592–93 (emphasis added). The term "confirmatory identification" is generally used when the perpetrator is previously known to or acquainted with the witness. Ibid. Here, Martinez did not know defendant before the aborted traffic stop. See supra note 8.

In sum, we conclude that the present identification "procedure" does not fall neatly into any recognized category that has been deemed in our caselaw either to be suggestive or not suggestive. Rather, so far as we have been able to determine, the distinctive circumstances in which Martinez came to view the driver's license photograph have not been addressed in any judicial decision discussing the reliability of a police officer's identification of a suspect. In the absence of social science research, we decline to speculate as to the suggestiveness of the particular investigative steps that were taken in this case. We are satisfied, however, that the trial court did not err, much less commit plain error, by failing to read the model jury charge concerning showup investigations. We add that defendant does not dispute that the trial judge properly instructed

20

the jury with respect to the relevant "estimator" variables, such as stress, distance, lighting, and cross-racial identification. Defense counsel focused on those factors in his summation, indicating that those were the circumstances affecting the reliability of Martinez's identification that were genuinely at issue in this case.

B.

We next address defendant's closely related contention that the trial court committed plain error in failing to deliver another portion of the model identification charge that explains that exposure to outside information may make an identification less reliable. That portion of the Model Jury Charge reads:

> You may consider whether the witness was exposed to opinions, descriptions, or identifications given by other witnesses, to photographs or newspaper accounts, or to any other information or influence, that may have affected the independence of his/her identification. Such information can affect the independent nature and reliability of a witness's identification and inflate the witness's confidence in the identification.
>
> [Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. May 18, 2020).]

Defendant now argues for the first time on appeal that Martinez "was exposed to information prior to identifying [defendant] that may have rendered

the identification unreliable." Defendant argues, for example, "he knew that the registered owner of the motorcycle had a son who also rode the bike." Defendant also points to Martinez's testimony that he was already practically certain that defendant was the driver before looking at his driver's license photo because of his prior interaction with Vasti.

As we have noted, the Model Jury Charge on out-of-court and in-court identifications was drafted at the request of the Supreme Court in Henderson and closely tracks the language in that landmark opinion. As we have also noted, the Court in Henderson did not address identifications made by police witnesses. Accordingly, the portion of the model charge concerning the effect of "other information" known to the witness does not relate specifically to information known to law enforcement officers. We reiterate, moreover, that in Pressley, the Court declined to extrapolate Henderson's best practice principles to identifications made by police witnesses, expressly acknowledging that "we cannot determine whether part or all of the protections outlined in Henderson should apply to identifications made by law enforcement officers." 232 N.J. at 592.

We likewise decline to rule that the "other information" principle underpinning the Model Jury Charge language at issue applies to identifications

22

made by police officers in general, much less by an officer who was the lead—in this case, sole—investigator in the case. We presume that local police officers will often be aware of information about persons who live or work in their jurisdiction, especially if those persons have had prior interactions with the criminal justice system. We also presume that officers will be aware of background information about a suspected offender before they sit down to prepare a police report or apply for a complaint-warrant. It seems self-evident, moreover, that the lead investigator on a case would be aware of information from multiple sources. In the absence of social science research on the effect of such external information on a police officer's ability to accurately identify a suspect, we decline to rule that this charge was required to be given sua sponte in the particular circumstances presented in this case.

We add that defendant was by no means deprived an opportunity to explore Martinez's knowledge—what he knew and when he knew it. On the contrary, these circumstances were elicited during counsel's thorough cross-examination. Nor was defendant denied an opportunity to argue to the jury that information Martinez learned before he reviewed the driver's license photograph compromised the reliability of his identification of defendant as the fleeing motorcyclist. The narrow issue before us in this appeal is not whether such

23

knowledge is relevant, but rather whether the trial court was required to deliver the "other information" portion of the Model Jury Charge.

We emphasize, finally, that defendant did not request this charge and did not propose a tailored version to address the fact that Martinez had conducted an investigation and had already ascertained the identity of the motorcyclist before he viewed defendant's photograph. Applying the plain error standard of review, and considering the overwhelming evidence that defendant was in fact the person riding his mother's missing motorcycle, defendant has not shown that any such instruction would have changed the outcome and that the failure to read that instruction was capable of producing an unjust result. R. 2:10-2; Torres, 183 N.J. at 564.

## C.

Finally, with respect to jury charges, defendant contends that the trial judge mistakenly instructed, "be advised that a witness' level of competence standing alone may not be an . . . indication of the reliability of the identification." (emphasis added). The court in reading this portion of the text of the Model Jury Charge misspoke, substituting the word "competence" for

"confidence."[9]  Defense counsel did not object to the misstatement at trial, and thus did not provide the judge an opportunity to correct the error.

Defendant contends on appeal that as a result of this error, "the jury never received the very important message that Martinez's confidence did not render his identification reliable."  In evaluating the impact of the trial court's slip of the tongue, we acknowledge that the State's case hinged on proving the identity of the motorcyclist.  Martinez was the State's only trial witness.  His identification of defendant was thus the crux of the State's case.  A witness' level of confidence, moreover, is without question a relevant consideration in evaluating the reliability of his or her identification.  See Henderson, 208 N.J. at 240 (alteration in original) (quoting State v. Romero, 191 N.J. 59, 75 (2007)) (noting the Court had previously recognized that "[j]urors likely will believe eyewitness testimony 'when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all.'").

---

[9]  The prosecutor's brief states that it is "unclear" if this is merely a transcription error.  The prosecutor, however, did not move to correct the transcript and abandoned that contention at oral argument before us.  We therefore accept defendant's argument that this mispronunciation constitutes error.

The matter of Martinez's level of confidence was explored during his cross examination. However, counsel in his summation did not focus on—or even mention—Martinez's level of confidence. Counsel in his closing arguments focused instead on other circumstances pertaining to the reliability of the identification. Counsel argued to the jury that "there are certain factors that go into an eyewitness identification that you're going to be instructed you must consider . . . ." Counsel proceeded to discuss the stress of a traffic stop, the short duration of the officer's interaction with the motorcyclist, that the perpetrator was wearing a motorcycle helmet, that it was dark outside, and that the motorcyclist was of a different race than the officer. Cf. Marshall, 123 N.J. at 145 (1991) (noting that the prejudicial effect is evaluated in light of the totality of the circumstances, including the arguments of counsel).

Furthermore, we must evaluate the one-word error in the context of the entire jury charge, which spanned thirty pages of transcript, not just the portion of the charge pertaining to eyewitness identifications, which spanned six pages of transcript. See Jordan, 147 N.J. at 422 (quoting Wilbely, 63 N.J. at 422) ("Portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect."). We deem it especially important, moreover, that the prejudicial effect of an error

26

must be considered, "in light 'of the overall strength of the State's case.'" Walker, 203 N.J. at 90 (quoting Chapland, 187 N.J. at 289). Considering all of these circumstances, we do not believe the trial judge's slip of the tongue rises to the level of plain error capable of producing an unjust result. See Montalvo, 229 N.J. at 320 (noting a failure to object invokes a "presumption that the charge . . . was unlikely to prejudice . . . defendant's case.").

### III.

We turn next to defendant's contention that the prosecutor committed misconduct twice during his closing arguments, first by suggesting that Martinez had received special training on how to observe and recall a suspect's facial features, and second by implying that defendant was responsible for presenting evidence that the motorcycle had been stolen and operated by someone else. We address each contention in turn.

Before doing so, we acknowledge the legal principles governing our review of prosecutorial misconduct. Because defendant failed to object at trial, we review the challenged comments for plain error. See R. 2:10-2. As we have already noted, under that standard we can reverse defendant's conviction only if the error was "clearly capable of producing an unjust result." Ibid.; State v. Cole, 229 N.J. 430, 458 (2017).

27

In State v. Frost, the Court held that "[g]enerally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial.  The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made."  158 N.J. 76, 83–84 (1999); accord State v. Irving, 114 N.J. 427, 444 (1989); State v. Ramseur, 106 N.J. 123, 323 (1987).  Failure to object also deprives the trial court the opportunity to take curative action.  Irving, 114 N.J. at 444.

A defendant's allegation of prosecutorial misconduct requires us to assess whether the defendant was deprived of the right to a fair trial.  State v. Jackson, 211 N.J. 394, 407 (2012).  To warrant reversal on appeal, the prosecutor's misconduct must be "clearly and unmistakably improper" and "so egregious" that it deprived defendant of the "right to have a jury fairly evaluate the merits of his defense."  State v. Wakefield, 190 N.J. 397, 437–38 (2007) (first quoting State v. Papasavvas (I), 163 N.J. 565, 625 (2000); and then quoting State v. Smith, 167 N.J. 158, 181–82 (2001)); see also Frost, 158 N.J. at 83; State v. Loftin, 146 N.J. 295, 386 (1996); Ramseur, 106 N.J. at 322.

In criminal cases, prosecutors "are expected to make vigorous and forceful closing arguments to juries."  Frost, 158 N.J. at 82 (citing State v. Harris, 141 N.J. 525, 559 (1995)).  Furthermore, "[p]rosecutors are afforded considerable

28

leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Ibid. "Even so, in the prosecutor's effort to see that justice is done, the prosecutor 'should not make inaccurate legal or factual assertions during a trial.'" State v. Bradshaw, 195 N.J. 493, 510 (2008) (quoting Frost, 158 N.J. at 85). Rather, "a prosecutor should 'confine [his or her] comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence.'" Ibid. (alteration in original) (quoting Smith, 167 N.J. at178). "So long as the prosecutor's comments are based on the evidence in the case and the reasonable inferences from that evidence, the prosecutor's comments 'will afford no ground for reversal.'" Ibid. (quoting State v. Johnson, 31 N.J. 489, 510 (1960)).

## A.

Defendant asserts that the prosecutor inappropriately bolstered Martinez's identification testimony by remarking, "[s]o you have someone who's trained to look at facial features, and to look at these things and to really notice what's going on." Defendant argues that the State offered no testimony that Martinez had special training regarding observation of facial features.

In Bradshaw, the Court addressed a prosecutor's remark that "'people with handicaps . . . have stronger sensory perception,' and that the victim was 'a

lifelong 40-year-old trained observer'" whose "whole world is about her ability to recognize things." 195 N.J. at 510. The victim was deaf and mute, and the prosecutor implied she had a stronger sensory perception than someone without those physical challenges. The Court determined that "the State did not present evidence that the victim had a stronger sensory perception because of her condition." Ibid. The prosecutors remark, the Court ruled, implied "that the victim would not make a mistake in her identification of defendant due to her heightened sensory ability and went beyond the reasonable inferences from the evidence in the case." Ibid.

We do not believe that the prosecutor's comment that Martinez was trained to look at facial features presented the same risk of prejudice that occurred in Bradshaw. While the prosecutor did not elicit testimony concerning the officer's training before mentioning it in summation, we believe it is generally known that police officers receive extensive training on how to perform their duties. In contrast to the improper remarks in Bradshaw, moreover, the prosecutor in this case did not suggest that Martinez's observational skills were superior to that of others, but only that he was trained to be observant.

We do not believe the prosecutor's remark went "beyond the reasonable inferences from the evidence in the case," as occurred in Bradshaw. Ibid. The

jury could reasonably infer the extent to which Martinez was observant in the course of performing his duties from the officer's detailed testimony regarding his actual observations of the motorcyclist's face and the attendant circumstances, including Martinez's detailed description of the lighting conditions.

Furthermore, we are satisfied that the prosecutor's brief reference to Martinez's training was not "clearly and unmistakably improper" and certainly was not "egregious." Wakefield, 190 N.J. at 437–38. That conclusion is supported by the fact that defense counsel offered no objection. Considering the totality of the circumstances, we conclude that the prosecutor's remark was not capable of producing an unjust result and did not deprive defendant of a fair trial.

B.

We next address defendant's contention that the prosecutor during his summation impermissibly shifted the burden of proof to the defense by remarking, "[y]ou didn't hear any testimony about the [motorcycle] being returned or the [motorcycle] being found somewhere else, or even that there was any actual evidence of a theft, other than someone's own statement that came from the defendant in this case, knowing he was being charged with a crime."

31

We are satisfied this remark did not have the impermissible burden-shifting impact that defendant now ascribes to it on appeal, as shown by defense counsel's failure to object when the remark was made. See Irving, 114 N.J. at 444 (Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial in the atmosphere of the trial). The prosecutor's remarks must be considered in context. The prosecutor certainly was free to question the credibility of Vasti's report that the motorcycle had been stolen, which was filed after the eluding incident and after Martinez had visited her house to investigate that incident. Cf. State v. Nelson, 173 N.J. 417, 473 (2002) ("A prosecutor may respond to defense claims, even if the response tends to undermine the defense case."). Furthermore, the trial court explained to the jury that, "[t]he burden of proving each element of the charge beyond the reasonable doubt rests upon the State, and that burden never shifts to the defendant." The judge added, "[t]he defendant in a criminal case has no obligation, nor duty, to prove his innocence or offer any proof relating to his innocence." Importantly, the judge also made clear to the jury that "defendant has neither the burden nor the duty to show that the crime[,] . . . if committed, was committed by someone else, or to prove the identity of that person."

Considering all relevant circumstances, we do not believe the prosecutor's remark was egregious, had a clear capacity to produce an unjust result, or deprived defendant of a fair trial. We presume the jury followed the court's instructions. See State v. Wilder, 193 N.J. 398, 415 (2008) ("We credit juries for following instructions carefully and applying the facts, as found, to the law, as instructed.").

## IV.

Defendant contends that the alleged trial errors, when considered cumulatively, warrant a reversal of his conviction and a remand for a new trial. In State v. Sanchez-Medina, the Court re-affirmed that, "[e]ven if an individual error does not require reversal, the cumulative effect of a series of errors can cast doubt on a verdict and call for a new trial." 231 N.J. 452, 469 (2018); see also State v. Reddish, 181 N.J. 553, 615 (2004) ("[A]lthough an error or series of errors might not individually amount to plain error, in combination they can cast sufficient doubt upon the verdict to warrant reversal."); State v. Weaver, 219 N.J. 131, 162 (2014) (concluding this was "a classic case of several errors, none of which may have independently required a reversal and new trial, but which in combination dictate[d] a new trial."); State v. Jenewicz, 193 N.J. 440, 474 (2008) (recognizing that even when individual errors do not amount to

reversible error, their cumulative effect can require reversal if they "prejudice[] the fairness of [the] defendant's trial and, therefore, cast[] doubt on the propriety of the jury verdict that was the product of that trial.").

In State v. Orecchio, the Court stressed that "the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may [not] be invoked to upset an otherwise valid conviction." 16 N.J. 125, 129 (1954). Moreover, it is well-settled that "[a] defendant is entitled to a fair trial but not a perfect one." Marshall, 123 N.J. at 170 (alteration in original) (quoting Lutwak v. U.S., 344 U.S. 604, 619 (1953)).

After carefully considering all of the trial errors that defendant alleges on appeal, we conclude that defendant received a fair trial and that none of defendant's contentions, viewed individually or collectively, cast doubt upon the verdict. Reddish, 181 N.J. at 615. We stress that while defendant may not have received a perfect trial, he received a fair one. Marshall, 123 N.J. at 170. We add that the State presented overwhelming evidence that defendant was the person operating his mother's missing motorcycle at the time of the traffic stop.

V.

Finally, we address defendant's contention that the trial judge imposed an excessive sentence. Defendant argues that "the trial court violated its

34

obligations to engage in qualitative analysis of the relevant aggravating and mitigating factors and to explain the reasons behind [defendant's] sentence." Defendant asserts that "the trial court engaged in no qualitative analysis whatsoever." The transcript of the sentencing proceeding belies that contention. The record clearly demonstrates that the trial judge carefully considered all of the statutory aggravating and mitigating factors, ascribed weight to those that the court found applicable to the offense and offender, and determined that the aggravating factors substantially outweighed the non-existent mitigating factors.

The scope of our review of sentencing determinations is narrow and those decisions are examined under a highly deferential standard. See State v. Roth, 95 N.J. 334, 364–65 (1984) (holding that an appellate court may not overturn a sentence unless "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."). Our review is limited to considering:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."

> [State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State
> v. McGuire, 419 N.J. Super. 88, 158 (App. Div.
> 2011)).]

Furthermore, "appellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). A trial court's exercise of discretion in accordance with sentencing principles "should be immune from second-guessing." State v. Bieniek, 200 N.J. 601, 612 (2010).

As defendant correctly notes, sentencing decisions are based on a qualitative rather than quantitative analytical process. State v. L.V., 410 N.J. Super. 90, 108 (App. Div. 2009) (citing State v. Kruse, 105 N.J. 354, 363 (1987)); see also State v. Denmon, 347 N.J. Super. 457, 467–68 (App. Div. 2002) (citing State v. Scher, 278 N.J. Super. 249, 273 (App. Div. 1994) ("Our sentencing statute contemplates a thoughtful weighing of the aggravating and mitigating factors, not a mere counting of one against the other.")).

In this instance, the trial court determined that defendant had previously been convicted of robbery and resisting arrest/eluding as well as multiple disorderly persons offenses. The court went through all of the statutory aggravating factors in sequence. The judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that the defendant will commit another

offense"); six, N.J.S.A. 2C:44-1(a)(6) ("[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted"); and nine, N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law"). The court assigned "substantial weight" to aggravating factor three, "moderate weight" to aggravating factor six, and "substantial weight" to aggravating factor nine.

The trial court next considered the statutory mitigating factors set forth in N.J.S.A. 2C:44-1(b), examining each one by one and concluding that none applied. The judge then found that "the aggravating factors certainly substantially outweigh the mitigating factors." The judge also found that a prison term above the seven-year mid-point of the second-degree range of ordinary sentences, N.J.S.A. 2C:43-6(a)(2), was warranted "[d]ue to defendant's criminal record and the nature of the present offense."

The record clearly shows that the sentencing court ascribed weight to each of the applicable aggravating factors, reflecting a qualitative assessment of the relevant circumstances. The court did not just add up the absolute number of applicable aggravating factors to weigh against the absence of any mitigating factors. Applying the deferential standard of review, and mindful that we are not to substitute our own judgment for that of the trial judge, we conclude that

the trial court did not abuse its discretion by imposing an eight-year prison term with a discretionary period of parole ineligibility fixed at four years. That sentence does not shock the judicial conscience. <u>Roth</u>, 95 N.J. at 364–65.

To the extent we have not addressed them, any remaining arguments raised by defendant on appeal lack sufficient merit to warrant discussion in this opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1603-19